**Vanessa REDGRAVE and Vanessa Redgrave Enterprises, Ltd., Plaintiffs,**

v.

**BOSTON SYMPHONY ORCHESTRA, INC., Defendant.**

Civ. A. No. 82–3193–K.

United States District Court, D. Massachusetts.

Feb. 13, 1985.

Daniel J. Kornstein, Kornstein, Veisz & Wexler, New York City, for plaintiffs.

Keith Long, Robert E. Sullivan, Herrick & Smith, Boston, Mass., for defendant.

Opinion

KEETON, District Judge.

Plaintiffs, Vanessa Redgrave (Redgrave) and Vanessa Redgrave Enterprises, Ltd., sued the Boston Symphony Orchestra, Inc. (BSO) for breach of contract and violation of the Massachusetts Civil Rights Act, Mass.Gen.Laws Ann. ch. 12, § 11H & § 11I (1984). Plaintiffs also made several claims that were held before trial to lack merit as a matter of law. *See Redgrave v. Boston Symphony Orchestra, Inc.*, 557 F.Supp. 230 (D.Mass.1983). All the asserted claims arose from BSO's cancellation of its performances of Oedipus Rex in Boston and New York, in which Vanessa Redgrave was scheduled to appear as narrator. Plaintiffs contend that BSO cancelled the performances in retaliation for Redgrave's public expressions on political issues. BSO argues primarily that the performances were cancelled because of a concern for physical security and a decision that risks of disruption would impair the artistic integrity of the performances. Because Vanessa Redgrave Enterprises, Ltd. was a party to the contract, the contract claim was made on behalf of both plaintiffs. The civil rights claim was asserted only by Redgrave.

The parties presented evidence on the contract and civil rights claims to a jury in a sixteen-day trial. The jury answered special interrogatories favorably to plaintiffs on the breach of contract claim and favorably to BSO on the civil rights claim. The parties have filed cross motions for judgment notwithstanding the jury's verdict.

The claims and defenses asserted during trial present many issues of first impression. Some of these issues are moot in view of the jury's answers to the interrogatories. Others must be resolved to determine the judgment to be entered. First, I address the state civil rights claim and deny Redgrave's motion for judgment notwithstanding the verdict. Second, I examine the breach of contract claim and the measure of damages for breach. I conclude that judgment is to be entered for plaintiffs on the breach of contract claim but that, as a matter of law, damages must be limited to the performance fee.

## I.

### THE CLAIM UNDER THE MASSACHUSETTS CIVIL RIGHTS ACT

 The Massachusetts Civil Rights Act provides for a private right of action against "any person or persons, whether or not acting under color of law, [who] interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth." Mass.Gen.Laws Ann. ch. 12, § 11H (1984); *id.* § 11I. At trial, Redgrave offered two theories to support her contention that BSO violated the civil rights act.

First, Redgrave contended that BSO cancelled the performances because of its disagreement with her public expressions of support for the Palestine Liberation Organization (PLO) and with the intent to retaliate against her for those expressions and to cause her to become less outspoken in the future. The first and second interrogatories submitted to the jury bear upon this theory (as well as bearing upon the claim for consequential damages for breach of contract, discussed in Parts II and III of this opinion). These interrogatories asked whether BSO's primary or only reason for cancelling was that agents who acted for BSO in making the decision to cancel did so because of their disagreement with Redgrave's publicly expressed political views (interrogatory 1), whether one or more of the BSO's agents urged cancellation because of their personal disagreement with those views (interrogatory 2A), and whether BSO would not have cancelled but for their influence (interrogatory 2B). *See infra* Appendix 1. The jury returned a verdict with negative answers to interrogatories 1 and 2A. By agreeing to the submission of interrogatories 6 to 10 with instructions that they were not to be answered in the event of negative answers to interrogatory 1 and either interrogatory 2A or 2B,

Redgrave acknowledged that the jury's negative answers to interrogatories 1 and 2A rejected an essential factual premise of Redgrave's first civil rights theory.

Second, Redgrave claimed that, even if BSO's decision to cancel was not made to express disapproval of her public expression of her political views, BSO should be held liable under the Massachusetts Civil Rights Act because BSO, in cancelling, acquiesced in expressions of disapproval voiced by BSO subscribers and other members of the community. This contention was not submitted to the jury because I concluded at trial, and adhere to the view now, that such acquiescence is not actionable under the Massachusetts statute. Although cancellation because of acquiescence when confronted with the public pressure of a vocal minority may be a breach of contract, it is not a violation of the Massachusetts Civil Rights Act. Neither the cancellation nor the acquiescence, unaccompanied by conduct and intent such as was the subject of interrogatories 1, 2A, 2B, and 6, amounts to "threats, intimidation or coercion," which must be proved to establish a claim under the statute.

The jury's negative answers to interrogatories 1 and 2A, together with the court's ruling on the second theory, preclude any claim based upon the civil rights statute if claims under that statute are subject to jury trial, as Redgrave has contended. If instead, as BSO has contended, a plaintiff asserting a claim under the Massachusetts Civil Rights Act is not entitled to a jury trial, then this court must make fact findings on the subject matter of the first two interrogatories. Both parties have also taken an alternative position that this court should treat the jury's findings as merely advisory. In this event, the court would also have to make findings, although it could treat the jury's findings in answer to interrogatories 1 and 2A as advisory.

I conclude that I need not resolve the difficult and debatable question whether claims under the Massachusetts Civil Rights Act are subject to jury trial in Massachusetts courts, and, if not, whether such

claims are nevertheless subject to jury trial in a federal court under the doctrine of *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). If a jury trial is appropriate, the jury's verdict stands, amply supported by evidence. If jury trial is not appropriate, then acting entirely independently as factfinder on the evidence received in this case, I make the same findings as did the jury in answering interrogatories 1 and 2A. Also, acting as factfinder but treating the jury verdict as advisory, I make the same findings. I have explained these findings in more detail in a separate memorandum filed on this date pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Thus, in all events, the questions submitted to the jury in interrogatories 1 and 2A are answered by the factfinder against the plaintiff Redgrave.

One further issue relevant to the civil rights claim is suggested by the testimony of one of BSO's trustees. That evidence would support a finding that one or more of BSO's trustees were concerned that the Redgrave-BSO performances would impair BSO's ability to raise funds from the public. On the basis of this evidence, a factfinder might have found that agents of BSO cancelled the performances because of a concern over fundraising. Redgrave chose not to advance this contention at trial, but instead argued that all of BSO's suggested motivations were pretexts for retaliation against Redgrave because of her support for the PLO. BSO also chose not to argue that the cancellation was grounded in concern over fundraising.

It is understandable that neither party chose to press this issue. On one hand, any claim that motivation concerned with fundraising for a charitable corporation should be treated in the law as invidious lacks support in precedent. Nor could such a motivation satisfy the requirement of "threats, intimidation or coercion" in support of a claim under the Massachusetts Civil Rights Act. On the other hand, any defense that interests in fundraising would justify protective rules in any way analogous to the protection guaranteed by the First and Fourteenth Amendments (discussed in Part III of this opinion) likewise lacks support. A motivation concerned with fundraising is neither specially forbidden as invidious nor specially protected by constitutional constraints. In any event, in view of the positions taken by the parties at trial, fundraising as a motivation or a justification is not now at issue in this case.

For the foregoing reasons, I conclude that judgment must be entered for the defendant on the claim under the Massachusetts Civil Rights Act. Thus, I need not and do not address defendant's other contentions that Redgrave could not maintain a civil rights action even if she proved the factual premises underlying her claim.

Judgment will be entered for BSO on the state civil rights claim.

## II.

### BREACH OF CONTRACT CLAIM

The plaintiffs' contract claim depends on whether defendant's cancellation constituted a breach of the contract and, if so, what damages are recoverable for that breach. To set the context for determining the disputed issues of law bearing upon the claim for breach of contract, I take account of some relevant premises of the legal system.

### A. PROTECTION OF FREEDOM IN THE LEGAL SYSTEM.

■ Protection of freedom is a prime objective of our legal system. Freedom of speech, freedom of artistic expression, freedom of contract, and freedom of choice on political and moral issues are among the protected activities. Implicit in the protection of freedom in these and other contexts is a conception of society in which pluralism may flourish. Individuals are free to be very different in their political and moral convictions, in their religious faiths, and in their artistic, social, and personal interests and activities. Individuals are free to come together in private organizations that express their personal interests, and the organizations that they create may be quite

diverse. Individuals may, for example, come together for political expression, for the practice of religion or the profession of faith, to foster recreational interests, or to promote their common interests in music, drama, or some other form of art. They are free to create a private entity that promotes one special interest and seeks to remain pluralistic in other respects, bringing together individuals who share one special interest even though they differ sharply about other matters—political, moral, religious, or artistic.

The law does not forbid an entity organized to promote a form of art—or those who function as its managerial agents—from taking account of recognized differences among its members and patrons regarding controversial political issues. For example, it is not illegal for a private entity to make a choice not to contract with an artist for a performance if its agents believe that the artist's appearance under their sponsorship would be interpreted by others as in some degree a political statement. Thus, BSO was entirely free not to make a contract with Redgrave for such reasons even though its agents considered her a superb actress and exceptionally qualified to perform as narrator in Oedipus Rex.

Once BSO contracted for Redgrave to appear in the production of Oedipus Rex, BSO gave up part of its freedom. By contracting with a party, however, an entity does not entirely surrender all of its freedom to act. BSO retained to a certain extent its interests in freedom of expression and freedom of choice at least regarding conditions that in good faith it considered essential to an artistic production or to protection against physical risks. The freedom that BSO retained may even include freedom to break the contract (subjecting itself of course to liability for damages under the law) for any reason other than one specially forbidden by the law (for example, discrimination on grounds of sex or race). The suggested freedom to break a contract and suffer liability only for the legally recognized damages is within the scope of the idea often referred to as Holmes' bad man theory of contract law—that one who is willing to pay the penalty of such damages as the law assesses is free to break the contract and pay. See O.W. Holmes, *The Path of the Law*, 10 Harv.L.Rev. 457, 461–62 (1897). As to contracts not specifically enforceable in equity, the law provides no other remedy. Even if it is inappropriate to say that one has a legal "right" to break the contract and pay the assessed damages, legal redress is limited to those damages. Of course, if this point of view is accepted, one must determine the critical question as to the measure of damages under the law. The measure of damages clearly includes the performance fee less any expenses that would have been incurred to perform the contract. Does it also include compensation for harm to Redgrave's professional career in the circumstances of this case? This perspective does suggest, however, that unless plaintiffs can demonstrate that the consequential damages they seek are within the scope of legal redress for breach of contract, or can show that BSO's reason for cancellation is one forbidden by the law in a sense beyond merely being a breach of contract, BSO is free to break the contract without incurring liability beyond the performance fee.

As noted above, even though individuals and entities are free in various contexts to make choices for whatever reasons they find sufficient, the law does impose constraints against actions based upon reasons that are classified as invidious (illustrated by discrimination on the basis of race or sex). Plaintiffs, of course, assert in this case that BSO cancelled for an invidious reason—retaliation against plaintiff because of her exercise of her right to speak freely on controversial political issues of worldwide concern. That contention was rejected by the jury in the answers to interrogatories 1 and 2A. As noted above, these findings are supported by the evidence. Thus, I need not consider whether an affirmative answer to one or both of these questions would have affected the

measure of damages for breach of contract.

## B. BREACH OF CONTRACT.

In analyzing plaintiffs' contract claim, I first turn to the question whether BSO's actions constituted a breach.

One component of the contract between plaintiffs and BSO is a written document sent to Redgrave by the BSO. (Exhibits 4 and 5). During trial, BSO claimed that under a clause in that document, the parties agreed that BSO could cancel the performances in circumstances that arose in this case without incurring liability to the plaintiffs. Interrogatory 3, submitting this contention, asked the jury whether BSO cancelled the performances because of "a cause or causes beyond the reasonable control" of BSO—the quoted phrase being taken from the contractual provision excusing performance. *See infra* Appendix 2 (instructions on interrogatory 3). The jury's negative answer is supported by evidence and defeats BSO's contention that its cancellation was not a breach of contract.

BSO's challenge on other grounds to the plaintiffs' claim for consequential damages does not in any way affect BSO's liability for the performance fee. As noted above, the law does not require that a producer enter into a contract without regard to the artist's political activities. Having entered into the contract, however, the producer may not break it without incurring liability for damages according to the law of contracts. Under the contract, plaintiffs were to receive a performance fee of $31,000, but were responsible for paying all travel expenses incidental to the engagement. The parties have stipulated that the net amount after expenses would have been $27,500. The jury's answer to interrogatory 3 establishes that plaintiffs are entitled to judgment for this amount, at least, as actual damages for breach of contract.

## C. CONSEQUENTIAL DAMAGES.

Plaintiffs argue that in addition to the performance fee they are entitled to consequential damages for Redgrave's loss of future professional opportunities caused by the breach of contract. Plaintiffs assert that the publicity of BSO's cancellation caused producers and theatre operators, who otherwise would have engaged Redgrave, not to do so. Under Massachusetts law, damages may be awarded for consequential harm if such harm was within the contemplation of the parties and was caused "directly" by the breach of "indirectly" by the combined effect of the breach and foreseeable intervening causes. *See, e.g., John Hetherington & Sons, Ltd. v. William Firth Co.*, 210 Mass. 8, 21, 95 N.E. 961, 964 (1911); *Monadnock Display Fireworks, Inc. v. Town of Andover*, 388 Mass. 153, 157, 445 N.E.2d 1053, 1056 (1983) (quoting *Hetherington*); *Abrams v. Reynolds Metals Co.*, 340 Mass. 704, 708–09, 166 N.E.2d 204, 207 (1960) (citing *Hetherington* and *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145 (1854)).

Under the court's instructions, the jury could find that harm to Redgrave's professional career, of which BSO's cancellation was a cause, was "within the contemplation of the parties" at the time of making the contract if, on the basis of what BSO did know at that time about her public expressions and anything more that it then should have known in the exercise of reasonable care, BSO did foresee or should have foreseen that harm to her career from the cancellation was sufficiently likely that it would have been taken into account by an ordinarily prudent person in assessing the costs and benefits of entering into the contract at the time of making the decision to contract. *See infra* Appendix 1 (interrogatories 4A and 4B); *infra* Appendix 2 (instructions on interrogatories 4A and 4B). The jury found that consequential harm was foreseeable in this sense and that $100,000 would fairly and adequately compensate Redgrave for such harm (answers to interrogatories 4A, 4B, and 5).

BSO presents several arguments to support its motion for judgment notwithstanding the verdict on the consequential damages. The first two arguments attack the findings on the basis of insufficiency of the evidence presented by the plaintiffs. The

remaining contentions assert that, even if the jury's verdict is supported by the evidence, this court must as a matter of law treat the finding of $100,000 in damages for harm to Redgrave's professional career as irrelevant to the judgment to be entered.

### 1. *Substantial Evidence Supporting an Award of Consequential Damages.*

First, BSO contends that the evidence was insufficient to support the jury's finding that harm to Redgrave's professional career was within the contemplation of the parties. I conclude that this contention is without merit.

■ Under Massachusetts law the legal standard as to what is within the contemplation of the parties includes consequences that were foreseeable to a person of reasonable prudence in the position of the party charged with the breach (BSO) at the time the contract was made. *Cf. John Hetherington & Sons, Ltd. v. William Firth Co.*, 210 Mass. 8, 21, 95 N.E. 961, 964 (1911) ("injured party shall be placed in the same position he would have been in, if the contract had been performed, so far as loss can be ascertained to have followed as a natural consequence and to have been within the contemplation of the parties as reasonable men as a probable result of the breach"). The evidence in this case was sufficient to support a finding that a reasonable person, having the knowledge of Redgrave's public expressions of political views that BSO had or should have had in the exercise of reasonable care at the time of contracting, would have foreseen harm to her professional career as a consequence of a cancellation by BSO.

Second, BSO contends that the evidence presented during trial was insufficient to support a finding as to any particular amount that is fair and reasonable compensation for harm to Redgrave's professional career—in other words, the plaintiffs have failed to prove with adequate certainty the damages caused by BSO's cancellation. This issue involves the need to separate the effect of the harm caused by Redgrave's political expressions from any added harm

caused by BSO's cancellation. BSO points to the general principle that plaintiffs have the burden of showing not merely a reduction of professional opportunities after BSO's breach as compared to those opportunities that would have been expected for one with Redgrave's qualifications as an actress; they must demonstrate the difference between the professional opportunities she had after the breach and the opportunities she would have had but for the breach. Thus, she must offer proof from which the jury could reasonably find, by a preponderance of the evidence, that her expressions on political issues would not have affected her professional opportunities but for the breach, or that the effect would have been more limited. BSO contends that the proof offered is too speculative to determine a reasonable award.

One response to these arguments points to instructive analogies in the precedents relating to tort actions for physical injuries to persons who have special susceptibilities to harm. Plaintiffs thus may invoke the rule that a wrongdoer takes the victim as is and therefore is liable for all of the harm resulting from aggravation of a pre-existing susceptibility to harm. *See generally Restatement (Second) of Torts* § 461 (1965). Nevertheless, the liability does not extend to harm that would have resulted from the pre-existing condition even if the tort had not occurred.

■ Although the issue presented as to the sufficiency of the evidence in this case is a close and debatable one, I conclude that the evidence is sufficient to support a finding that the BSO cancellation was a but-for cause of substantial harm to Redgrave's professional career and that $100,-000 in damages is reasonable compensation for that harm. Plaintiffs' inability to prove the measure of the harm precisely does not defeat the claim under Massachusetts contract law. *See generally Rombola v. Cosindas*, 351 Mass. 382, 385, 220 N.E.2d 919, 922 (1966) ("In determining the amount of damages to be awarded, mathematical accuracy of proof is not required."); *National Merchandising Corp. v. Leyden*, 370

Mass. 425, 430, 348 N.E.2d 771, 774 (1976) ("It is recognized that 'an element of uncertainty in the assessment of damages is not a bar to their recovery.'"). *See also Computer Systems Engineering, Inc. v. Qantel Corp.*, 740 F.2d 59, 67 (1st Cir.1984) (interpreting Massachusetts law).

### 2. *Legal Barriers to an Award of Consequential Damages.*

BSO argues also that, apart from requirements as to the contemplation of the parties and certainty of proof, consequential damages for harm to Redgrave's professional career are not recoverable as a matter of law. This contention invokes interests in freedom of expression that I address in Part III.

### III.

### LEGAL PROTECTION OF FREEDOM OF EXPRESSION

BSO contends that plaintiffs' claim for consequential harm to Redgrave's professional career implicates, first, constraints imposed by the First and Fourteenth Amendments to protect against intrusive state action, including judicially created state law rules that allow damages awards based upon communicative conduct, and, second, state law constraints aimed at protecting freedom of expression. These contentions require closer examination.

In the circumstances of this case, in order to establish that BSO's breach of contract caused loss of future opportunities for professional engagements, plaintiffs must prove that in some way information about BSO's action was communicated to others, that they thereafter acted differently because of the communicated message, and that BSO is legally responsible for harm caused by that communication and its consequences. These requirements are not independent elements of a cause of action for breach of contract. Instead, they emanate, by necessary implication, from a requirement of proof of causal connection between breach and harm; that is, in the context of this case, causal connection can-

not be proved in any other way. Nonetheless, these corollaries of requiring proof of cause in the circumstances of the present case are closely analogous to recognized elements of the law of defamation—treated in that context as elements independent of theories of legal cause.

Judicial opinions resolving disputed claims in the law of defamation have exposed a clash among sets of interests that are all valued highly in the legal system. The clash of these highly valued interests remains, whatever the rubric of theory may be—whether, for example, it is "contemplation of the parties" or "proximate cause" rather than "privilege" incident to constitutional and other legal protections for freedom of expression.

As already noted, BSO invokes the First and Fourteenth Amendments on the factual premise that the evidence in this case would not support a finding that BSO's cancellation caused harm to Redgrave's career by any means other than some form of communication by BSO to others. In other words, the only possible mechanism of harm to Redgrave's professional career, revealed by the evidence, is the alleged influence of some statement made by BSO on later decisions of others—a statement of fact or opinion implied in BSO's cancellation, or express or implied in BSO's press release.

I conclude that BSO is correct in asserting that this factual premise is an inescapable element of the claimed causal connection between BSO's cancellation and consequential harm to Redgrave's professional career. The evidence does support the jury's finding, in answer to interrogatories 4A, 4B, and 5, that BSO's cancellation was a cause, along with other causes, of harm to her professional career for which $100,000 is reasonable compensation. But it does so only because a factfinder may reasonably infer that others, upon receiving the news of BSO's cancellation, interpreted the cancellation as conveying a message about Redgrave. No evidence was presented as to any means by which BSO's cancellation could cause others to deny her per-

formance opportunities unless they first learned about the cancellation and derived some message from it.

The testimony regarding the one loss of an opportunity that was specifically identified at trial illustrates the point. The witness Theodore Mann testified that he decided against offering Redgrave a role in "Heartbreak House," playing at the Circle in the Square Theater in New York, because of BSO's cancellation. His explanation was, in essence, that if BSO couldn't take the risk, neither could he.[1] The necessary implication is that he interpreted BSO's cancellation as saying BSO had decided it could not take the risk of presenting Redgrave in a live performance for one or more of the reasons to which he alluded, including concerns about fundraising, ticket sales, and physical disturbance of the performances.

At various points during the trial—for example, when the potential relevance of proffered evidence was at issue (*e.g.,* Transcript, October 31, 1984, Vol. 9, Morning Session, pp. 63–65, 68–72, 78–79; Transcript, October 30, 1984, Vol. 8, pp. 99–101, 105–113; Transcript, October 25, 1984, Vol. 5, pp. 17–32), as well as in consultations concerning the interrogatories to be submitted to the jury (*e.g.,* Transcript, November 1, 1984, Vol. 10, Afternoon Session, pp. 41–45; Transcript, November 2, 1984, Vol. 11, pp. 167–75; Transcript, November 6, 1984, Vol. 13, Morning Session, pp. 52–62; Transcript, November 6, 1984, Vol. 13, Noon Lobby Conference, p. 29)—plaintiffs' counsel were invited to make a proffer of any factual and legal theories that would

support any other mechanism or sequence by which a connection could be shown between BSO's cancellation and Redgrave's later loss of one or more professional opportunities that she claims she would have been offered but for the BSO cancellation. All factual hypotheses advanced had one characteristic in common. Expressly or impliedly, they depended on the decision of another person, who otherwise would have offered Redgrave a performance opportunity, not to do so because that other person was influenced by some message he or she derived from the BSO cancellation and the press coverage that followed. With understandable zeal of advocacy, plaintiffs' counsel phrased their hypotheses in ways that did not explicitly identify any communicative step in the sequence of causation. Yet, close analysis revealed its presence in every hypothesis advanced. The imagery of a chain of causation is apt here. Though the stated hypotheses did not express the communicative link in the chain of causation, there is in every hypothesis advanced a missing link unless the communication of some message from BSO to others can be found. The presence of this communicative link invokes the analogy to the law of defamation.

Under the law of defamation, at least as applied to media defendants, a public figure plaintiff may not recover damages unless he or she can establish clearly and convincingly that the defendant had knowledge of the falsity or acted in reckless disregard of the truth of the defamatory matter published. *See, e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct.

---

1. In answer to a question as to why he decided against hiring Redgrave, Mann said:

 The Boston Symphony Orchestra had canceled, terminated Ms. Redgrave's contract. This had a—this is the premier or one of the premier arts organizations in America who, like ourselves, seeks support from foundations, corporations, individuals; have subscribers, sell individual tickets.

 I was afraid that and those in my organization were afraid that this termination would have a negative effect on us if we hired her. And so we had conferences about this. We were also concerned about if there would be any physical disturbances to the performance.

 And there were many long discussions about this with myself, my partner, Paul Libin, Rex Harrison who was the star of the show and had cast approval, and Anthony Page who was the director. And it was finally decided prior to the meeting with Ms. Redgrave in September of '83 that we would not hire her because of all of the events that had happened, the cancellation by the Boston Symphony and the effects that we felt it would have on us by hiring her.

 Transcript, October 31, 1984, Vol. 9, Afternoon Session, pp. 24–25.

2997, 3008, 41 L.Ed.2d 789 (1974). The Supreme Court has not yet determined whether these protections are also available to non-media defendants. *See Greenmoss Builders, Inc. v. Dun & Bradstreet, Inc.*, 143 Vt. 66, 461 A.2d 414, *cert. granted,* —— U.S. ——, 104 S.Ct. 389, 78 L.Ed.2d 334 (1983) (argued Mar. 21, 1984, reargued Oct. 3, 1984). Even if they are not, however, state law protects against liability for harm caused by truthful statements of fact about a person. *See, e.g., Restatement (Second) of Torts* § 581A (1977).

The suggested analogy to defamation cases adds substantial weight to the defense position that the judgment in this case should not include damages for consequential harm. If a judgment for such damages were entered, pursuant to this court's enforcement of state law, that application of state law would constitute state action to which Fourteenth Amendment constraints (and First Amendment constraints through Fourteenth Amendment incorporation) would apply. *Cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 256, 276–78, 84 S.Ct. 710, 713, 723–24, 11 L.Ed.2d 686 (1964). The debatable issues as to whether federal constitutional constraints and state constitutional and decisional constraints against state law defamation awards would be extended to state law awards for consequential harm as to which a communicative link is essential to the causal chain are issues of first impression. But the analogy is compelling.

▪ Plaintiffs contend that the analogy to defamation cases should be rejected. They argue that the interests they assert here, in contrast with those asserted by a plaintiff in a defamation case, are of the type that ranks highest in the First Amendment hierarchy—Redgrave's interests in freedom of expression and freedom from retaliation against her because of her openly expressed political views. Extending the notion of retaliation to harm to Redgrave's professional career caused by publicity generated by BSO's cancellation, plaintiffs have explicitly referred to the interests they assert here as "First Amendment"

rights. In fact, the alleged intrusions upon plaintiffs' interests in freedom of expression are not intrusions against which the First Amendment (or the Fourteenth by incorporation of the First) affords protection. The First and Fourteenth Amendments protect only against governmental intrusions. *See, e.g., Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976) (First Amendment); *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 114, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973) (same); *Blum v. Yaretsky*, 457 U.S. 991, 1002, 102 S.Ct. 2777, 2784, 73 L.Ed.2d 534 (1982) (Fourteenth Amendment); *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948) (same). The intrusion alleged in this case is an intrusion by a private entity—BSO. Nonetheless, the interests in freedom of expression that plaintiffs assert are highly valued in our legal system. First and Fourteenth Amendment protections against governmental intrusion are only part of the total array of legal protections of freedom of expression.

Even though incorrectly characterized by plaintiffs as invoking First Amendment rights, their argument as to the high value the law places on Redgrave's interests in freedom of expression is cogent. Their argument shows at least that the issue presented in this case is not directly controlled by precedent—that it is truly one of first impression. The defense argument, fairly appraised, shows not that logic requires the denial of consequential damages but that the analogy to defamation suggests it.

It is debatable whether interests in free expression generally would be more effectively protected and promoted if the legal system awarded damages in the circumstances presented here, to vindicate compelling interests in free expression (represented by the plaintiffs in this instance), even though doing so would to some extent impair interests in free expression, or interests in freedom of action with communicative implications (represented by defendant

in this instance). If the issue is framed in terms of which outcome is more likely to serve and promote freedom of expression in the long run, the answer is unclear. Certainly a rule of law allowing consequential damages would deter breach. But it would deter contract as well. It is a question open to debate whether in the long run artists who openly express their political views would be offered more performance opportunities if such a rule were clearly established as applicable law. I conclude that the issue concerning the law applicable to claims of consequential harm such as this one, when squarely presented to the courts of last resort—state and federal— will be resolved on other grounds and not by answering this debatable question about the net impact of different rules of law on freedom of expression by performing artists.

■ A more compelling ground for resolving the issue is that legal constraints protecting freedom of expression are primarily designed as a shield, not a sword. They may be invoked generally in defense of freedom and only rarely to sustain an action for damages. The legal system stands ready to shield freedom against unlawful governmental intrusion, but reluctant to use the sword of damages to vindicate one claim of freedom by striking down another. *Cf. NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920–32, 102 S.Ct. 3409, 3430–36, 73 L.Ed.2d 1215 (1982) (holding that First Amendment principles preclude recovery under state law for damages caused by speech or other protected conduct).

In a system of equal justice, a conception of freedom that depends upon repressing equal freedom of others is self-contradictory. In relation specifically to freedom of expression—whether political or nonpolitical, artistic or banal, vital or frivolous—invoking the compulsion of law to compensate for the impact of one exercise of freedom upon another would be in the long run self-defeating. Inevitably it would draw the legal system into making judgments about the content of expression—the very

kind of governmental action that is most threatening to individual freedom.

I conclude that the analogy to defamation cases is compelling. Predicting the resolution of issues in courts of last resort, as I must do in order to determine the judgment to be entered in this case, I conclude that both state and federal constraints against damages awards will be imposed by the courts of last resort when these issues are presented for decision, and that these constraints bar the plaintiffs' claim for consequential damages in the circumstances of the present case.

■ I conclude further, that one of these legal constraints upon awards of damages is that a plaintiff who seeks an award for harm connected with the wrongful act of the defendant through a communicative link must show at least that the communicative link involved some unprivileged statement. Absent such a showing, the causal connection between wrong and harm is broken because an essential link of the chain is itself legally protected expression. Thus, a plaintiff who seeks to use a communicative link as a part of the chain of causation must disentangle actionable expression from protected expression in that communicative link. This conclusion is supported not only by analogy to the law of defamation but also by analogy to *Claiborne Hardware*, 458 U.S. at 915–18, 102 S.Ct. at 3427–28 (state tort law may compensate a retailer for loss of customers intimidated by defendants' violence but the First and Fourteenth Amendments preclude an award that includes as well compensation for loss of customers dissuaded from trading by protected speech and political activity).

The communicative link may, of course, be either a statement of fact or a statement of opinion. Each statement of fact or opinion may be express or it may be implied. If a statement of fact, it may be true or it may be false. If a statement of opinion, it may be an opinion that BSO's managerial agents did in fact hold, or it may be one they did not hold. Will any of the communicative links that now remain as factual

possibilities, after taking account of the jury's answers to interrogatories, sustain liability for consequential harm to Redgrave's professional career?

■ Accepting the analogy to the law of defamation, I conclude, first, that plaintiffs are not entitled to harm caused by any message conveyed by BSO's cancellation if in substance that message was no more than a statement of fact about Redgrave that is not shown to be false or a statement of opinion that was in fact held. Second, even if some element of the message was a false statement of fact about Redgrave or a statement of opinion not in fact held, additional barriers to liability must be overcome before an actionable claim for harm to Redgrave's professional career is established. Plaintiffs must prove that the harm was caused by some impermissible element or elements of the message rather than by legally privileged expressions of fact or opinion. As stated above, disentangling privileged from actionable expressions is a burden that plaintiffs must meet to establish liability for harm to Redgrave's professional career.

Viewed in the perspective of the defamation analogy, this claim is brought by and on behalf of a person who is a "public figure" both because of her acknowledged recognition as an actress and because of her having voluntarily expressed her views openly on political issues of worldwide interest and concern. Consultations between the court and counsel, during preparation of the charge to the jury, disclosed that on this point there is no dispute. Thus, in whatever way the communicative content of BSO's actions may be described, as a formulation of the contention that BSO's cancellation foreseeably caused Redgrave to lose professional opportunities that would otherwise have been available to her, the legal argument for allowing damages for the resulting harm must overcome BSO's claim of freedom to act as it did, in order to serve the artistic and security interests that it alleges as a basis for its actions, even though its action implicitly had communicative consequences of harm to Redgrave's professional career. Because the analogy to the law of defamation is apt, it is a likely prediction that the higher courts where this unsettled issue must ultimately be resolved will hold that plaintiff can succeed in this burden only by showing that BSO has impliedly communicated to others some material statement of fact (and not merely opinion) about Redgrave that it knew to be false, or that BSO acted with reckless disregard for the truth or falsity of a material statement of fact it impliedly communicated. *Cf. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974) (public figure "may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.").

In the present case, harm to Redgrave's career resulting from any implied statement about her—including any statement about the extent of her public expression on political issues—plainly would not be actionable if the statement was true. Plaintiffs were invited to call to the court's attention any factual hypothesis, supported by evidence, involving a false statement of fact about Redgrave that was allegedly implied in BSO's cancellation and press release. The best efforts of plaintiffs' counsel to respond to this invitation were incorporated in five formulations they submitted to the court near the close of extended consultations on this subject. These were proposed as statements that might be placed before the jury as a basis for interrogatories asking the jury to determine whether or not any such statement was impliedly communicated by BSO's cancellation and press release and, if so, whether the statement was false and whether BSO knew it to be false or acted with reckless disregard for its truth or falsity. The five formulations were as follows:

1. Because Vanessa Redgrave was engaged to narrate the "Oedipus Rex" centenary concerts, those concerts were irreparably wrecked and had to be cancelled.

2. Vanessa Redgrave's politics created such turmoil, disturbance and opposition that the Boston Symphony Orchestra's centenary "Oedipus Rex" concerts were irreparably wrecked and had to be cancelled.

3. Vanessa Redgrave's engagement to play the role of narrator in the Boston Symphony Orchestra's "Oedipus Rex" centenary concerts caused the concerts to be cancelled because the Boston Symphony Orchestra received threats both to disrupt the performance and to withhold significant financial support if she appeared, many performers refused to perform if she appeared and the artistic integrity of the performance would have been compromised if she appeared.

4. Vanessa Redgrave could not be permitted to appear in the role of narrator of the "Oedipus Rex" centenary concerts because to permit her to appear in those concerts would pose unacceptable risks to the audience, to the musicians and to Symphony Hall.

5. Vanessa Redgrave cannot be hired to perform without wrecking a production and no measures can be taken to protect against such damage.

Plaintiffs' Proposed Inserts for Special Interrogatories, Docket No. 268 (Nov. 6, 1984).

Close analysis reveals that each of these formulations of some message allegedly conveyed by the BSO cancellation includes one or more opinions. None of these formulations disentangles from opinion a statement of fact about Redgrave that with support in evidence, the jury could find to be false and to have been made with knowledge of falsity or with reckless disregard for its truth or falsity.

I do not fault plaintiffs' counsel for their inability to produce any formulation that might appropriately have been submitted to the jury. Rather, the compelling conclusion is that the evidence would not support any such formulation. I concluded then, and adhere to the conclusion now, that affirmative answers to the questions proposed by plaintiffs (whether BSO's cancell-ation and press release impliedly conveyed any of the messages described in the formulations stated above) would provide no basis for a judgment for plaintiffs. Such findings would not identify any statement of fact about Redgrave. Moreover, the proposed submissions wholly fail to disentangle any factual statement that might also, with support in evidence, have been found to be false, and the statement of which might itself have been found to be a cause of harm.

Thus, plaintiffs failed entirely to meet their burden of identifying any way of disentangling protected expression from a form of expression that even arguably might be actionable.

I turn, finally, to possible hypotheses about expressions of opinion as part of the communicative link between BSO's cancellation and harm to Redgrave's career.

The Supreme Court has declared that opinion statements are constitutionally protected. "Under the First Amendment there is no such thing as a false idea." *Gertz*, 418 U.S. at 339, 94 S.Ct. at 3007.

Relevant sections of the *Restatement (Second) of Torts*, drafted after *Gertz* and with painstaking attention to the implications of *Gertz*, call attention to the possibility that a statement in opinion form may impliedly state facts. *See Restatement (Second) of Torts* §§ 566, 581A comment c (1977). In this case, however, as noted above, plaintiffs have wholly failed to identify any statement of fact that can be disentangled and treated as a basis for a claim.

It may also be argued that a legally cognizable claim could be established by proof that BSO made a statement that it held an opinion which in fact it did not hold. (For convenience I refer to the opinion of BSO rather than to the opinion of its managerial agents. The charge to the jury dealt with this matter by including instructions on a state of mind requirement as applied to a corporation. *See infra* Appendix 2 (instructions on interrogatory 6).).

In the face of *Gertz*, it is a dubious contention that damages may be awarded for harm caused by a false statement that the speaker holds an opinion that in fact the speaker does not hold. One may read *Gertz* as indicating that the Supreme Court has determined that an unacceptable chilling of expression would result if one were subject to litigation of claims on this ground. That is, one may read *Gertz* as saying that opinion statements are not actionable, even upon a showing that the person expressing the opinion did not in fact hold that opinion. *See Gertz*, 418 U.S. at 339–40, 94 S.Ct. at 3006–07. I need not address that question in this case, however. For the explicit purpose of determining whether the facts of this case presented such a legal issue for decision, plaintiff's counsel were invited to submit proposed interrogatories that would identify any potentially actionable statement of opinion that a factfinder might have found, with support in evidence, to have been stated even though not held by BSO and to have been a causal link between BSO's cancellation and harm to Redgrave's career. The plaintiffs' proposals wholly failed to disentangle any such opinion from protected expression. Consultation over these proposals did, however, lead to the formulation of the questions that were submitted as interrogatories 11A, 11B, and 11C. The jury's negative answer to interrogatory 11A leaves plaintiff with no factual basis, even on this legally tenuous theory, for a claim of consequential harm caused by BSO's falsely stating an opinion it did not hold.

In summary, analogies to *Claiborne Hardware* and to precedents regarding claims for defamation support the conclusion that, on the evidence presented and the findings of the jury in answers to interrogatories 1, 2A, and 11A, plaintiffs' claim for consequential harm to Redgrave's professional career must be denied. The jury's answers to interrogatories 4A, 4B, and 5 (finding $100,000 in damages for harm to Redgrave's professional career) are therefore irrelevant, as a matter of law, to the judgment to be entered.

## IV.

Judgment will be entered for plaintiffs, on the breach of contract claim, in the amount of $27,500, and for defendant as to all other claims.

On November 16, 1982, defendant made a Rule 68 offer of judgment in the amount of $31,000. *See* Fed.R.Civ.P. 68. Judgment finally obtained by plaintiff being "not more favorable than the offer," costs will be assessed in conformity with Rule 68. The parties are directed to confer about the specific amount due and are directed to report within ten days whether or not they are able to agree. The Clerk is directed to withhold entry of final judgment pending the report from counsel.

## APPENDIX 1

### VERDICT

1. Was the only reason, or the primary reason, that the Boston Symphony Orchestra (BSO) cancelled the arrangements for Vanessa Redgrave to appear in the performances of Oedipus Rex, in which Vanessa Redgrave was to appear as narrator, that the agents who acted for the BSO in making the decision to cancel disagreed with political views that Vanessa Redgrave had publicly expressed?
Answer YES or NO. __NO__

2A. Did one or more of the agents of the BSO take a position in favor of cancellation of the arrangements because of disagreement with political views that Vanessa Redgrave had publicly expressed?
Answer YES or NO. __NO__

IF YOU ANSWERED YES TO QUESTION 2A, ANSWER THE FOLLOWING. IF YOU ANSWERED NO TO QUESTION 2A, SKIP QUESTION 2B.

2B. Do you find that the BSO would not have cancelled the arrangements but for the influence of that position taken by the BSO's agent or agents? Check the appropriate box.

YES, they would not have cancelled ☐

NO ☐

IF YOU ANSWERED YES TO QUESTION 1 OR YES TO BOTH PARTS OF QUESTION 2 OR YES TO ALL THREE, SKIP QUESTION 3. IF YOU HAVE ANSWERED NO TO QUESTION 1 AND NO TO EITHER PART OF QUESTION 2, ANSWER QUESTION 3.

3. In cancelling the arrangements for Vanessa Redgrave to appear in performances of Oedipus Rex, did BSO do so because of a cause or causes beyond the reasonable control of the BSO?

Answer YES or NO. NO

IF YOU HAVE ANSWERED NO TO QUESTION 1, NO TO EITHER PART OF QUESTION 2, AND YES TO QUESTION 3, SKIP ALL REMAINING QUESTIONS. OTHERWISE, PROCEED TO QUESTION 4A.

4A. Did BSO's cancellation of the arrangements for Vanessa Redgrave to appear in performances of Oedipus Rex cause consequential harm to her professional career?

Answer YES or NO. YES

IF YOU HAVE ANSWERED NO TO QUESTION 4A, SKIP QUESTION 4B. IF YOU HAVE ANSWERED YES TO QUESTION 4A, ANSWER QUESTION 4B.

4B. Was harm to Vanessa Redgrave's professional career a foreseeable consequence within the contemplation of the parties at the time they entered into the contract?

Answer YES or NO. YES

IF YOU ANSWERED NO TO QUESTION 4A OR NO TO QUESTION 4B, SKIP QUESTION 5. OTHERWISE, ANSWER THIS QUESTION.

5. What amount, if any, of money paid now in cash, is required to compensate plaintiffs fairly and reasonably for any harm to Vanessa Redgrave's professional career that you find by a preponderance of the evidence was caused by BSO's cancellation of the arrangements for Vanessa Redgrave to appear in performances of Oedipus Rex?

Answer in DOLLARS or NONE. $100,-000.00

IF YOU HAVE ANSWERED NO TO QUESTION 1 AND NO TO EITHER PART OF QUESTION 2, SKIP QUESTIONS 6–10. OTHERWISE, PROCEED TO QUESTION 6.

6. Did the BSO or its agents, in March and April 1982, threaten, intimidate, or coerce Vanessa Redgrave for the purpose of interfering with or attempting to interfere with her civil right to free expression of her political views?

Answer YES or NO._____

7. Do you find that the BSO would not have cancelled the arrangements for Vanessa Redgrave to appear in performances of Oedipus Rex but for the fact, if you find it to be a fact, that one or more of the BSO's trustees opposed Vanessa Redgrave's political views and wanted to retaliate against and punish her for those views and to coerce and intimidate her into becoming less outspoken in her views?

Answer YES or NO._____

IF YOU HAVE ANSWERED NO TO QUESTION 6 AND NO TO QUESTION 7, SKIP QUESTIONS 8–10. OTHERWISE, PROCEED TO QUESTION 8.

8. What amount, if any, of money paid now in cash is required to compensate Vanessa Redgrave fairly and reasonably for any harm that you find by a preponderance of the evidence was suffered by her as a consequence of the BSO's interference with her civil rights through its threat, intimidation or coercion?

Answer in DOLLARS or NONE._____

_____

IF YOU ANSWERED WITH A DOLLAR AMOUNT OTHER THAN NONE TO QUESTION 5 AND ANSWERED QUESTION 8 WITH A DOLLAR AMOUNT OTHER THAN NONE, ANSWER THE FOLLOWING QUESTION. OTHERWISE, SKIP THIS QUESTION.

9. What amount, if any, of the sum you found in answering Question 8 is for harm to Vanessa Redgrave's professional career

that you took into account in answering Question 5?

Answer in DOLLARS or NONE._____

_____

IF YOU ANSWERED QUESTION 8 WITH A DOLLAR AMOUNT OTHER THAN NONE *AND* DID NOT ANSWER QUESTION 5, OR ANSWERED QUESTION 5 NONE, ANSWER THE FOLLOWING QUESTION. OTHERWISE, SKIP THIS QUESTION.

10. What amount, if any, of the sum you found in answering Question 8 is for harm to Vanessa Redgrave's professional career?

Answer in DOLLARS or NONE._____

_____

IF YOU HAVE ANSWERED NONE TO QUESTION 5, AND NONE TO QUESTION 10, SKIP QUESTION 11. OTHERWISE, ANSWER QUESTION 11.

11A. Did BSO's cancellation and press release impliedly state to others that BSO's managerial agents held the opinion that Vanessa Redgrave was so controversial because of her publicly expressed political views that the risks associated with the series of performances in Boston and New York, in which she was to appear as narrator, were too great to be acceptable to a prudently managed symphony orchestra?

Answer YES or NO. NO

IF YOU HAVE ANSWERED NO TO QUESTION 11A, SKIP ALL REMAINING QUESTIONS. OTHERWISE, PROCEED TO QUESTION 11B.

11B. If so, do you find that in fact BSO's managerial agents did not hold that opinion? Check the appropriate box.

YES, they did not so hold ▢

NO ▢

11C. What amount, if any, of the damages you found was caused by harm to Vanessa Redgrave's professional career that she would not have suffered if this statement as to the opinion of BSO's managerial agents had not been made?

Answer in DOLLARS or NONE._____

_____

APPENDIX 2

Charge to the Jury

MEMBERS OF THE JURY:

It is now time for me to give you instructions on the law. To help you understand and remember the instructions, I will divide them into two main parts: first, general instructions, intended to guide you throughout your deliberation, second, instructions about the claims and defenses in this case.

Part I

. . . .

Part II

*The Contract Claim*

It is undisputed that the BSO and Vanessa Redgrave entered into a contract that provided for Vanessa Redgrave to appear as narrator in live BSO performances of Oedipus Rex (three performances in Boston and two in New York). The parties agree that one component of the contract is a written document sent to Vanessa Redgrave by the BSO (Plaintiffs' Exhibits 4 and 5). This document was not signed. The parties agree, however, that they orally agreed to a contract including the terms stated in the written document. They do not agree as to whether or not any additional terms were part of the oral agreement. The two disputed issues that bear upon this law suit are (1) the interpretation of the cancellation clause contained in the written agreement sent to Vanessa Redgrave by the BSO; and (2) what damages for the breaking of the contract were "foreseeable consequences within the contemplation of the parties" at the time the contract was made. I will further explain these issues and terms after I give you some general instructions about contracts.

A "contract" is an agreement between two or more persons called "parties" to do or not do a certain thing. A contract may be either "express" or "implied," or partly express and partly implied.

An "express" contract is one the terms of which are stated in words. An express contract may be oral as well as written. It is simply a verbalized agreement between the parties to do or not to do a certain thing for a "consideration." Mutual promises are sufficient "consideration."

An essential element of an express contract is the mutual consent of the parties that is communicated by each party to the other party.

Consent is not mutual unless the parties agree upon the same terms and conditions in the same sense. Consent can be effectively communicated only by some act or omission which is intended to communicate consent, or which indicates to the other party (or parties) that it is intended to communicate consent.

An implied contractual term is one which is not expressly stated in the contract but which, from the sense of the agreement as a whole, appears to have been intended by the parties to be a part of their contract.

When part or all of an agreement is written, you may consider any evidence as to which party drafted it, and if you find a relevant provision to be ambiguous, you may resolve ambiguity against the drafter, subject of course to your resolving it in a way that is a reasonable interpretation.

### Resolving Disputes as to the Terms of a Contract

The basic guideline in deciding what the terms of the contract are is the stated understanding and stated intent of the parties at the time they entered into the contract. The stated intent of the parties is determined by considering the relationship of the parties, what they said and did when entering into the contract, and all of the circumstances in which they entered into the contract as shown by the evidence before you.

When a contract is entirely written, or when there is no dispute about what was said by the parties when they orally agreed to a contract, the interpretation of that contract is ordinarily a matter of law for the court to decide. However, when the agreement was at least partly oral and determining exactly what was said and in what context depends on weighing evidence, it may be necessary for the jury to resolve some dispute as to the terms of the contract. This is such a case. In doing this, you must, of course, follow the instructions of the court as to the applicable law.

In resolving a dispute about any term or terms of a contract in this case, you are to be guided by the following rules:

First. A contract must be viewed as a whole and construed so that each clause helps to interpret the other.

Second. The words used in a contract are to be understood in their ordinary and popular sense, unless there is evidence that the parties intended to give them some different meaning.

Third. A contract should be given a reasonable interpretation and one which effectuates the parties' mutual intent as they manifested it.

Fourth. The manifested intent of the parties may be determined by their acts and expressed understandings.

### Reasons for Cancellation and Their Bearing on Liability and Damages

The first three questions I am submitting to you concern contentions of the parties regarding reasons for the BSO's cancellation of the arrangements for Vanessa Redgrave to appear in performances of Oedipus Rex.

The BSO claims that it cancelled the arrangements for Vanessa Redgrave's appearance in the performances of Oedipus Rex for causes beyond the reasonable control of the BSO. The BSO claims that a clause contained in the written form of agreement which they sent to Vanessa Redgrave allowed them to do so in the circumstances that arose in this case.

Vanessa Redgrave and Vanessa Redgrave Enterprises, Ltd., as plaintiffs, claim that the cause of the cancellation of those arrangements was entirely within the control of the BSO. Thus, they contend that the clause to which I referred does not

excuse the BSO's actions. They claim, instead, that BSO cancelled for reasons with which Questions 1 and 2 are concerned. Question 3 on the verdict form asks you to determine if the cause or causes of the cancellation was beyond the reasonable control of the BSO.

It is for you to determine which of these positions of the parties is supported by the evidence before you. Questions 1, 2, and 3 concern what you find to have been reasons for the BSO's cancellation. After reading the questions to you, I will explain what I mean by some of the words and phrases appearing in the questions.

Now, I will read Questions 1 and 2.

[Read Questions 1 and 2]

You will note that the terms "agent" and "agents" are used in Questions 1 and 2. Also, Question 2 and other questions later ask about actions or decisions "of the BSO." And Question 1 uses the phrase "the agents who acted for the BSO in making the decision."

These words and phrases require some explanation.

*Acts of a Corporation*

The BSO is a private, non-profit charitable corporation organized under Massachusetts law to promote the performance and enjoyment of music. A corporation is in law a person, but of course it cannot act otherwise than through its trustees, or officers, or other agents. The law therefore holds a corporation responsible for all acts of its trustees, or officers, or other agents, if those acts are done within the scope of their authority.

Every act of every trustee, or officer, or other agent, on behalf of, or in the name of a corporation, if done within the scope of his authority, is in law the act of the corporation itself.

To be within the scope of authority, an agent's acts must be done in the ordinary course of some part of the business or affairs of the corporation that the particular agent is authorized to do on behalf of the corporation.

A single trustee of a corporation does not have authority to make a decision for the corporation. Of course, he has authority to participate in deliberations about a decision that is to be made either by a vote of trustees or by an officer or agent to whom authority to make the decision has been delegated, and if he does so participate, then he is an agent acting within the scope of his authority as to his participation in deliberations, even though having no authority to make the decision.

Authority to act for a corporation in a particular matter, or in a particular way or manner, may be inferred from the facts and circumstances shown by the evidence in the case. That is to say, authority to act for a corporation, like any other fact in issue in a case, need not be established by direct evidence, but may be established by indirect or circumstantial evidence.

Question 1 asks you about the state of mind of the agents who acted for the BSO in making the decision to cancel—that is, the state of mind of the agents who had the authority to make the decision to cancel and exercised that authority. Was their only reason or primary reason for cancelling the arrangements for Vanessa Redgrave's appearance that they disagreed with Vanessa Redgrave's political views? It is not enough for plaintiff to show that those agents disagreed with her political views. You can answer Question 1 YES only if you find from a preponderance of the evidence, first, that the agents who were authorized to and did make the decision disagreed with her political views and, second, that this was the only reason or the primary reason they made the decision to cancel.

Question 2A asks if because of disagreement with Vanessa Redgrave's political views, one or more agents, during consultations on the matter, took a position in favor of cancellation. If so, Question 2B asks, would the decision by the agent or agents having authority to make that decision not have been made but for the influence of that position in favor of cancellation?

In explaining Question 1, I said that it asks about a state of mind concerned with reasons for cancellation—the state of mind of the agent or agents who had authority to and did make the decision to cancel.

Because motive or reason or reasons for acting is a state of mind, you must find, by a preponderance of the evidence, that in fact that state of mind existed. Thus, it is not enough to find that other persons with whom that person associated had that state of mind. The question is whether the agent whose state of mind you are considering had that state of mind. Of course, you may infer reasons or motives by considering both the direct and the circumstantial evidence bearing on that issue.

Question 1 asks you about the state of mind of the agent or agents who were authorized to and did in fact make the decision to cancel.

Question 2A, in contrast, asks you about the state of mind of an agent or agents who took a position in the discussion that preceded the decision, whether or not that agent or agents was authorized to make the decision. Thus, Question 2 asks about the influence, if any, of that position on the decision made by the agent or agents with authority to decide.

If you find by a preponderance of the evidence that BSO's primary reason or only reason for cancelling was that the agent or agents acting for BSO in making the decision to cancel disagreed with political views that Vanessa Redgrave had publicly expressed, you will answer Question 1 YES. Otherwise, answer it NO.

If you find by a preponderance of the evidence that one or more agents of BSO took a position in favor of cancellation because of disagreement with political views that Vanessa Redgrave had publicly expressed, you will answer Question 2A YES. Otherwise, answer it NO.

If you find that BSO would not have cancelled but for the influence of that position taken by the BSO's agent or agents, you will answer Question 2B YES. Otherwise, answer Question 2B NO.

To express this another way: if one or more of BSO's agents took this position but that did not influence BSO's decision because BSO would have cancelled anyway, for other reasons, then plaintiff has failed to prove that this position of one or more agents was a legal cause of the decision.

To repeat, then, if you find that BSO would not have cancelled but for an agent's or agents' position in favor of cancellation because of opposition to Vanessa Redgrave's political views, you will answer YES to Question 2B. Otherwise, answer NO.

If you answer YES to Question 1 or YES to both parts of Question 2 or YES to all three, you will have found that BSO cancelled because of a cause within its reasonable control. In that event, the instruction before Question 3 tells you to skip Question 3. Otherwise, you will answer Question 3.

*Causes Beyond the Reasonable Control of a Party to a Contract*

I will now read Question 3 on the verdict form.

[Read Question 3]

The BSO claims that under a clause contained in the written form of agreement which they sent to Vanessa Redgrave, the parties understood that the BSO could cancel the performances in the circumstances that arose in this case. Here is the wording of that clause:

> In case either of the parties to this Agreement shall be prevented from performing or carrying out any of its obligations hereunder by any cause beyond such party's reasonable control, including but not limited to illness, any act of God, strike, labor dispute, fire, flood, or public disaster, it is understood and agreed that there shall be no claim for damages by the other party in consequence of said non-performance. In such event, however, this Agreement shall remain in full force and effect to the extent that it can be performed. Without limiting the generality of the foregoing, if as a result of any cause

beyond the reasonable control of the Orchestra, the cancellation or suspension of the concert season or any portion thereof, or the weeks of tour and Festival weeks, or any concert is required there shall be no liability upon the Orchestra by reason of such cancellation or suspension.

This clause means that the BSO can cancel the contract or suspend its performance without incurring any liability if the reason for the cancellation is an event or events beyond its reasonable control which occur after the making of the contract which prevent the parties from carrying out their manifested intent.

If a private organization makes a contract with an artist, and, when doing so, knows or in the exercise of reasonable care should know that the artist has made controversial political statements, then the private organization is bound by its choice. It may not back out of the contract merely because of criticism or pressure from others growing out of their opposition to the artist's political views unless it is willing to pay for the harm caused by such an action. Thus, it is not a "cause beyond the reasonable control" of the BSO, as that phrase was used in the contract, if you find that, when the BSO entered into a contract with Vanessa Redgrave for her to appear as the narrator in performances of Oedipus Rex, the agent or agents who acted for BSO in making the contract knew, or in the exercise of reasonable care should have known, that she had made public statements on controversial political issues, and that the BSO later received expressions of disapproval and protest that were stronger or more heated or agitated than they expected on the basis of which they concluded that the likelihood of disruption of performance was greater than they had expected when entering into the contract.

If, however, you find that the reaction was so extreme that it was not reasonably foreseeable, you may take that into account in determining your answer to this question.

You must decide whether events had occurred or facts existed at the time the BSO cancelled the arrangements for Vanessa Redgrave to appear in performances of Oedipus Rex which the parties could not remedy, which were therefore beyond their reasonable control and which prevented the performances from going forward as planned. In doing so, you must bear in mind that any cancellation or suspension pursuant to the clause must be based on events that have occurred which rendered performance impossible or impracticable. Invocation of the clause may not be based on speculation, but reasonable apprehension about the risks of future events occurring based upon events that have occurred, may be taken into account in determining whether performance of the contract has been rendered impossible or impracticable.

In the present case, I instruct you that you will find that BSO cancelled the arrangements for Vanessa Redgrave's appearance in performances of Oedipus Rex because of "a cause or causes beyond the reasonable control" of the BSO if you find that the degree of disapproval and protest at a time after the making of the contract and before the BSO cancelled, was so much greater than the BSO expected, or should have expected in the exercise of reasonable care when making the contract, that an ordinarily prudent person, in the position of the BSO at the time it made the contract, would not have regarded that kind of reaction as one of the foreseeable risks. By "foreseeable risks" we mean those risks that a reasonable person (knowing what the BSO's agents knew or should have known in the exercise of reasonable care at the time of making the contract) would take into account as substantial and material factors bearing on the choice as to whether or not to enter into the contract.

In addition, when considering "circumstances beyond the reasonable control" of the BSO, you may also consider whether the general doctrine of frustration applies to this situation. The doctrine of frustration excuses parties from performing a contract where the objectives of the contract are utterly defeated or frustrated by cir-

cumstances arising after the contract was made.

In determining whether the BSO's cancellation was justified under this doctrine, you should consider the mutually shared objectives of the parties at the time of the formation of the contract, as manifested by the parties' statements, express or implied. Then, you should determine whether those mutually shared objectives were substantially frustrated by a subsequent event. The mutually shared objectives of the contract should be viewed in broad terms. The frustration must be severe for this doctrine to apply; that is, the principal purpose of the contract between the BSO and Vanessa Redgrave must be utterly defeated because of an event or events which occurred subsequent to the making of that contract. Also, in order for this defense to be supported, you must find that the frustration of the contract resulted without fault on the part of the BSO. You may consider whether the frustrating event or events were foreseeable at the time the contract was made and whether or not the BSO did or, in the exercise of reasonable care, should have foreseen and taken into account the risk of their occurrence. If you find that such events were reasonably foreseeable by the BSO and that the BSO took the possibility of such events occurring into account at the time that it made its contract with Vanessa Redgrave, or that if acting reasonably it should have done so, then the doctrine of frustration of purpose will not apply.

If, in accordance with these instructions, you find by a preponderance of the evidence that some event or events frustrated the objectives of the contract, or if you find on some other basis that BSO cancelled because of "a cause or causes beyond its reasonable control," you will answer Question 3 YES. Otherwise, you will answer Question 3 NO.

If BSO's cancellation of the arrangements for Vanessa Redgrave to appear in performances of Oedipus Rex is not determined to be legally excused, then the BSO will be liable at least for the performance fee. If you answer YES to Question 1 or YES to both parts of Question 2, or if you answer Question 3 NO, I will enter judgment for the plaintiff against BSO in the amount of $27,500, which the parties have stipulated to be the amount of the performance fee less expenses not incurred. For this reason I have instructed you not to include the performance fee in any of your findings regarding damages.

If you do not find that the cancellation was due to circumstances beyond the BSO's reasonable control, you must also answer additional questions on the verdict form.

*Consequential Harm Within the Contemplation of the Parties*

[Read Question 4A]

By consequential harm to her professional career I mean harm in the sense of loss of opportunities to appear in other professional performances she claims that she suffered as a consequence of the cancellation of the performances with the BSO.

You will note that Question 4A and the instructions I have already given use the term "cause."

For harm to be caused by the cancellation, as the term "cause" is used throughout these instructions, the cancellation of the performances must have played a part in bringing about the harm. There may, of course, be more than one cause for any harm or event. Thus, the word "caused" in these instructions means "was a cause."

The term "cause" as used in all these questions and throughout my instructions means "a legally responsible cause" or, as it is often called, "a proximate cause." "Consequence" as used in all the questions and throughout my instructions means something that "a legally responsible cause" plays a part in producing.

Proximate cause is a technical legal term, the meaning of which I will now explain. You cannot extract that meaning from the phrase proximate cause itself. So you will need to pay close attention to my explanation.

Keep two ideas in mind.

First, if the harm would have happened anyway for other reasons regardless of the cancellation, then the cancellation is not a proximate cause of that harm. This idea is more often expressed as a "but-for" rule rather than a "would-have-happened-any-way" rule. But these are just two different ways of explaining the same idea. Lawyers and judges seem to prefer the double negative form—that is, the way of speaking that says: to find the cancellation a proximate cause of harm you must find that the harm would not have occurred but for the cancellation. Another way of expressing the point is to say, if the harm would have happened anyway—regardless of the BSO's cancellation—then the cancellation was not a proximate cause of that harm.

For example, if you find that after the BSO's cancellation a third person made an independent assessment of Vanessa Redgrave's suitability for employment and decided against employing her because of concern about her public expression of political views, that third person's failure to employ her was not caused by the BSO's cancellation. On the other hand, if you find, for example, that a third person learned about BSO's cancellation, was influenced by it, and made a decision against employing her that he would not have made if he had never heard about the BSO cancellation, and you also find the element of foreseeability (which I will explain in a moment) satisfied, you may find that BSO's cancellation was a legally responsible cause of that loss of employment. Evidence of the conduct and decisionmaking of third persons, like evidence on any other fact in dispute, may be either direct evidence or circumstantial evidence. If you find that the evidence is insufficient for you to make a finding without speculating or guessing, then the plaintiffs have not met their burden of proof on the causation issue. But you are not limited to findings based on evidence of specific decisions not to employ the plaintiffs. It is for you to determine whether the direct and circumstantial evidence is sufficient to support a finding, based on evidence, that third persons who otherwise would have employed Vanessa Redgrave in the period after BSO's cancellation decided against doing so because they were influenced by BSO's cancellation. Thus, in summary, you may award damages for any lost work only if you find that BSO's cancellation was a substantial factor in a third person's decision not to employ Vanessa Redgrave and the third person would not have made the same decision but for BSO's cancellation.

Second, either the harm must have been a direct result of the cancellation (without any intervening force or the decision of any other person coming to bear) or the harm must have been foreseeable in a general sense—not precisely the way it happened, but a harm of that general type or kind must be reasonably foreseeable. Plaintiffs' claim that BSO's cancellation caused harm by influencing the decisions of others. Thus, to show that the BSO's cancellation proximately caused loss of other professional opportunities, in this way, plaintiff must show that it was foreseeable that BSO's cancellation would affect the decision of others. The idea of foreseeability is also expressed by the phrase "natural and probable consequence."

Now, putting these two ideas together in one definition of proximate cause, I instruct you as follows:

You will find that BSO's cancellation was a proximate cause of harm to Vanessa Redgrave's professional career if you find, from a preponderance of the evidence in the case, that the harm would not have occurred but for the cancellation and that the harm was a natural and probable consequence of the cancellation.

The plaintiffs have the burden of proving by a preponderance of the evidence the claimed causal relationship between the BSO's cancellation and the plaintiff's claimed harm. You are not allowed to speculate on the question of causal relationship.

If you find that plaintiffs have met this burden, you will answer Question 4A YES.

▮▮▮▮▮▮▮▮▮

Otherwise, you will answer Question 4A NO.

[If you have answered 4A YES, read 4B]

Damages are allowed for consequential harm to her professional career only if the harm was a foreseeable consequence within the contemplation of the parties to the contract when it was made.

By the phrase "harm that is a foreseeable consequence within the contemplation of the parties" we mean harm of a kind within one or more of the following groups: (1) harm of a kind that was referred to in communications between the parties while they were negotiating at or before the time the contract was made; (2) any other harm of a kind foreseeable as sufficiently likely to result from cancellation that it would have been taken into account in the exercise of reasonable care in assessing the possible costs and benefits of the proposed contract and in deciding whether or not to enter into the contract. The test of foreseeable harm is an objective one based on what a party to the contract, at the time of making the contract, knew or had reason to foresee or had reason to know or ought to have known would be harm which could result from the breach of the contract. To be within the contemplation of the parties, the harm must be of a kind that either was foreseen or else was foreseeable by a reasonable person in the position of the party now being sued, taking into account the facts and circumstances that party or its agents knew, as well other facts and circumstances, if any, which a reasonable person in that position would have known through the exercise of reasonable care. Thus, in order to find that consequential harm was within the contemplation of both parties in this case, you must find that BSO's agents knew or should have known, when the contract was made, that there was a substantial likelihood that a cancellation would be likely to cause Vanessa Redgrave to lose other professional work.

The plaintiffs have the burden of proving by a preponderance of the evidence that the harm was a foreseeable consequence within the contemplation of the parties.

You are not allowed to speculate on this question.

If you find that plaintiffs have met this burden, you will answer Question 4B YES. Otherwise, you will answer Question 4B NO.

[Read Question 5]

Plaintiffs contend in this case that BSO's cancellation was a cause of harm to Vanessa Redgrave's professional career in two ways. First, plaintiffs say that since BSO was a prestigious cultural organization, the very fact that it decided to cancel rather than proceed with performances in which Vanessa Redgrave was to appear would tend to influence others not to offer her future professional opportunities.

Second, plaintiffs contend that BSO's cancellation and press release impliedly stated to others that BSO's managerial agents held the opinion that Vanessa Redgrave, because of her publicly expressed political views, was so controversial that the risks associated with the series of performances in Boston and New York, in which she was to appear as narrator, were too great to be acceptable to a prudently managed symphony orchestra. Plaintiffs contend that this alleged implied statement of opinion influenced others not to offer her opportunities they otherwise would have offered. Question 11 concerns this contention particularly, and I will be giving you more instructions in connection with that question. Bear those instructions in mind also as you consider Question 5.

In answering Question 5, it will be for you to determine whether the evidence supports either, both, or neither of these contentions.

If you have found that the required relationship exists between Vanessa Redgrave's harm and the BSO's cancellation, by answering YES to both Questions 4A and 4B you may award reasonable and fair damages. The purpose for awarding an amount of damages is to put a plaintiff in as good a position as the plaintiff would have been in had it not been for the defendant's wrongful conduct.

The fact that the precise amount of damages may be difficult to ascertain does not defeat a right to recovery. However, any damages awarded must be based upon evidence you have heard. An award must not be speculative.

If you find wrongful conduct and find that it caused harm, then you may also consider whether that conduct not only caused harm but also caused uncertainty about the precise amount of that harm. If you so find you may take that into account in determining whether you can find a particular dollar amount of harm proved by a preponderance of the evidence. Another way of expressing this idea is to say that in determining whether the direct and circumstantial evidence supports a finding in some amount you may consider the extent to which availability of evidence was affected by the wrongful conduct.

Also, on the other hand, if a plaintiff's own conduct, either before or after the defendant's action, produced circumstances that caused or contributed to uncertainty about the precise amount of any harm of which the defendant's conduct was a cause, you may take that fact into account. A plaintiff is not in any sense relieved of the burden of proof merely because of difficulties of proof arising from uncertainties to which plaintiff's own conduct has contributed.

If you find that Vanessa Redgrave's public expression of political views had had an effect, before the BSO cancellation, of reducing the professional opportunities she otherwise would have had and that her public expression, either before or after the cancellation, continued to have such an effect after the cancellation, plaintiffs are not entitled to damages for any loss of professional opportunities after the cancellation that would have occurred anyway, because of the effect of her public expression of political views, even if the BSO had not cancelled. If, however, her professional opportunities would have been reduced to some extent by reason of her public expression of political views and they were reduced still further by the influence of the BSO cancellation, plaintiffs are entitled to compensation for this additional harm (the difference between what her opportunities would have been if the cancellation had not occurred, and what they were as a result of the combined effect of her public expressions and the cancellation) if you find that such a difference and its amount have been proved by a preponderance of the evidence.

Now I turn to what in law is referred to as mitigation of damages.

The law requires that anyone who claims damages as a result of the conduct of another must exercise reasonable care to take advantage of any reasonable opportunity to mitigate—that is to reduce or limit—the resulting harm.

If you find that after the BSO cancellation Vanessa Redgrave rejected employment opportunities to pursue interests apart from professional opportunities or acted unreasonably in not accepting professional opportunities available to her you may reduce your finding of consequential damages to a sum that would be fair and reasonable compensation for the more limited harm she would have suffered had she acted reasonably to mitigate damages.

In summary, in determining the amount of damages you award, if any, you must consider all the evidence presented in the case bearing on that subject. You must decide, from a preponderance of the evidence, the amount, if any, of money paid now in cash, that is required to compensate plaintiffs fairly and reasonably for any harm that you find was suffered by plaintiffs as a consequence of the BSO's cancellation. Plaintiffs have the burden of proving by a preponderance of the evidence the amount of damages. You must not include in or add to an otherwise just award any sum that is speculative rather than being supported by a preponderance of the evidence. Also, you must not include any sum for the purpose of punishing the BSO for its decision.

*Massachusetts Law on Violation of Civil Rights*

Plaintiffs in this case, in addition to their claims for breach of contract, as to which I

have now given you full instructions, have also made a claim based on alleged violation of a Massachusetts statute that provides legal remedies in defined circumstances for violations of civil rights. This statute went into effect on February 14, 1980, and up to this time the Supreme Judicial Court of Massachusetts, whose decisions I must follow as precedents in applying Massachusetts law, has had no occasion to interpret that statute in relation to claims such as are made in this case.

After conferring with the attorneys in this case, I have concluded I will need your answers not only to Questions 1 and 2 but as well to additional questions on the verdict form, to enable me to determine what judgment to enter on the claims of violation of the Massachusetts statute on civil rights. However, if you answer NO to Question 1 *and* NO to either part of Question 2, you will not answer any other question concerning the civil rights claims in this case.

[Read Question 6]

*Civil Rights Act—Liability*

With regard to the Massachusetts Civil Rights Act, Vanessa Redgrave contends that the BSO cancelled the arrangements for her to appear in Oedipus Rex because of the opposition of one or more of the BSO's agents or trustees to her political views and their desire to retaliate against her for those views and to coerce and intimidate her into becoming less outspoken. The BSO contends that it cancelled the arrangements because of concern about disruption and the effect of her appearance on the artistic integrity of the performances, and concern about safety and security.

In order to prove that the BSO interfered or attempted to interfere with Vanessa Redgrave's civil rights under the Massachusetts Civil Rights Act, the plaintiff, Vanessa Redgrave, must show by a preponderance of the evidence that the BSO, through its agents, threatened, intimidated, or coerced her for the purpose of interfering with, or attempting to interfere with her civil right to free expression of her

political views and that such conduct by the BSO was a proximate cause of harm suffered by her.

I instruct you that as applied to this case a "threat" means a communicated intent to cause physical or other harm, which may include mental or emotional harm, to person or property or contractual rights, with the purpose of causing the person to whom the threat is made to give up some right or thing or to act in the way the person making the threat directs.

"Intimidation" means putting another person in fear for a like purpose.

"Coercion" means use of threat, intimidation, force, compulsion, or duress for a like purpose. Coercion may include depriving a person of a contractual right to work in retaliation for the person's political views with the purpose of causing that person to alter those views or to become less outspoken.

If you find that the BSO, through its agents, threatened, intimidated, or coerced Vanessa Redgrave, you must then consider whether the BSO, or its agents, intended through such threats, intimidation, or coercion to interfere with her right to free expression of her political views. In considering whether the BSO or its agents intended to interfere with Vanessa Redgrave's right to free expression of her political views, I instruct you that BSO, as a corporation, can act only through its agents. The law holds BSO responsible for the acts of its agents if, but only if, those acts were within the scope of the authority of the agents. If you find that a particular agent engaged in threats, intimidation, or coercion and when doing so was acting in his or her ordinary course of duties with the BSO and intended to interfere with Ms. Redgrave's right to free expression of her political views, then you may find that the BSO so intended.

If you find that plaintiff has proved by a preponderance of the evidence that BSO used threat, intimidation, or coercion for the purpose stated in Question 6 and that it was a proximate cause of harm suffered by

Vanessa Redgrave, you will answer YES. Otherwise, answer NO.

[Read Question 7]

As to Question 7, I remind you of my previous instructions on threat, intimidation, and coercion. If you find that plaintiff has proved by a preponderance of the evidence that one or more of the BSO trustees opposed Vanessa Redgrave's political views and wanted to retaliate against and punish her for those views and to coerce and intimidate her into becoming less outspoken in her views, and if you find also that BSO would not have cancelled but for the trustee or trustees' position, you will answer YES. Otherwise, answer NO.

[Read Question 8]

If you answered YES to Question 6 or YES to Question 7, then you must determine the amount of damages, if any, which should be awarded to the plaintiff.

In order to recover any damages for violation of the Massachusetts Civil Rights Act, the plaintiff must prove that she suffered harm or injury because of the BSO's intentional interference or attempted interference with her civil rights. In determining the amount, if any, of damages to be awarded under this Act, you may consider the "chilling effect," if any, of the BSO's actions on Vanessa Redgrave's exercise of her civil right of free expression of political views, the deprivation or "chilling," if any, of her right to associate artistically with fellow artists, and the damage, if any, to her professional career caused by that violation of her civil right. You may also consider any mental or emotional harm which the plaintiff has claimed that she suffered as a result of any threats, intimidation, or coercion by which the BSO interfered with or attempted to interfere with Vanessa Redgrave's civil rights, if you find that such an interference or attempt occurred.

However, you may not speculate on the amount of damages which she is entitled to recover for this injury. The plaintiff has the burden of proving that she suffered harm or injury by a preponderance of the evidence. Only such damages may be awarded as will reasonably and fairly compensate Vanessa Redgrave for injury or harm that you find by a preponderance of the evidence was caused by the BSO's intentional interference or attempted interference with her civil rights. As I instructed you earlier, you may not include in or add to an otherwise just award any sum for the purpose of punishing the BSO or showing that you disagreed with its actions.

I am submitting three additional questions to you in order to make clear whether there is any overlapping of your findings of damages after you have made findings concerning damages in your answers to Question 5 and to Question 8. If you answered with a DOLLAR AMOUNT other than none for *both* Question 5 and Question 8, I will ask you to answer Question 9, which reads as follows:

[Read Question 9]

Question 10 also deals with the possibility of overlapping damages and should be self-explanatory.

[Read Question 10]

If you have answered NONE to Question 5, and NONE to Question 10, skip all remaining questions. Otherwise, answer Question 11.

[Read Question 11A]

I ask Question 11 in order to know the basis for your answers to both Question 5 and Question 10. Therefore, I am asking you to answer Question 11 about whether you find support for what I previously referred to as the second contention of the plaintiffs as to how the BSO's cancellation caused harm to Ms. Redgrave's professional career.

The contention is this: plaintiffs say that BSO's cancellation and press release impliedly stated to others that BSO's managerial agents held the opinion that Vanessa Redgrave was so controversial because of her publicly expressed political views that the risks associated with the series of performances in Boston and New York, in which she was to appear as narrator, were too great to be acceptable to a prudently

managed symphony orchestra. Plaintiffs say further, that BSO held no such opinion, and further that this implied statement of opinion influenced other persons not to offer Vanessa Redgrave opportunities they otherwise would have offered.

In answering Question 11A, you must understand what I mean by statements that are impliedly made. You may find that the BSO, in cancelling the arrangements for Vanessa Redgrave to appear in Oedipus Rex, impliedly said something to the public in addition to saying merely "we have cancelled."

As I have stated, plaintiffs contend in particular that BSO's cancellation and press release impliedly stated to others that BSO's managerial agents held the opinion that Vanessa Redgrave was so controversial because of her publicly expressed political views that the risks associated with the performances in which she was to appear were too great to be acceptable to a prudently managed symphony orchestra. You must determine if the BSO's cancellation and press release impliedly stated that BSO's managerial agents held such an opinion. In considering this question, you should consider both the actions taken by the BSO in cancelling the arrangements for Vanessa Redgrave to appear and any public statements made by the BSO in cancelling, the arrangements. It is plaintiffs' burden to show by a preponderance of the evidence that the BSO's cancellation and press release impliedly stated that the BSO's managerial agents held the opinion stated in Question 11A. You may not speculate as to whether the BSO's cancellation and press release impliedly stated that the BSO's managerial agents held such an opinion. Your finding must be a finding from a preponderance of the evidence.

If you answer YES to Question 11A, that the BSO's cancellation and press release impliedly made this statement to others, then you must answer Question 11B.

[Read Question 11B]

This question asks you whether or not you find, by a preponderance of the evi-dence, that the BSO's managerial agents did *not,* in fact, hold the opinion expressed in the statement impliedly made by the cancellation and press release.

[Read Question 11C]

Question 11C asks you to determine what amount of damages, if any, such an implied statement caused if it was made. The law may or may not allow plaintiffs to recover this sum. That is a legal question that I will have to decide before entering judgment.

Except as I have indicated otherwise by instructions to skip questions, based upon answers to previous questions, it is necessary to have your answers to all these questions in order to determine what judgment should be entered.