VANESSA REDGRAVE & another[1] vs. BOSTON SYMPHONY
ORCHESTRA, INC.

Suffolk.  May 7, 1986. — January 21, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Civil Rights,* Availability of remedy, Coercion by third party. *Statute,* Construction.

In response to a question of law certified to it by the United States Court of Appeals for the First Circuit calling for interpretation of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H & 11I, the Supreme Judicial Court held that the action of the defendant, Boston Symphony Orchestra, Inc., in cancelling a concert performance in which one of the plaintiffs, a professional actress, was to appear as narrator, came within the provisions of the act, where the defendant, although it had no desire to interfere with the actress's exercise of her protected rights of free speech, had acquiesced to pressure from third parties who, because of the actress's political activities and views, did wish to interfere with her exercise of such rights.[99-100] WILKINS & ABRAMS, JJ., concurring. O'CONNOR & LYNCH, JJ., dissenting.

In response to a question of law certified to it by the United States Court of Appeals for the First Circuit calling for interpretation of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H & 11I, the Supreme Judicial Court held that, where liability on a claim under the act was based upon the defendant's acquiescence to third-party pressure, it was not a defense for the defendant to show that its actions were independently motivated by additional concerns such as the threat of economic loss, physical safety, or particular concerns about the defendant's course of business. [100-101] WILKINS & ABRAMS, JJ., concurring. O'CONNOR & LYNCH, JJ., dissenting.

QUESTIONS OF LAW certified to the Supreme Judicial Court by the United States Court of Appeals for the First Circuit.

*Daniel J. Kornstein* of New York for the plaintiffs.

*Robert E. Sullivan (John T. Harding, Jr., & Cheryl W. Heilman* with him) for the defendant.

[1] Vanessa Redgrave Enterprises, Ltd.

*Diana T. Tanaka*, Assistant Attorney General, for the Attorney General, amicus curiae, submitted a brief.

*Marc D. Stern, Lois Waldman & Ronald A. Krauss* of New York, *Marvin N. Geller & Thomas M. Sobol*, for American Jewish Congress, amicus curiae, submitted a brief.

*Marjorie Heins, F. Anthony Mooney & Robert P. Sherman*, for Lawyers' Committee for Civil Rights Under Law of the Boston Bar Association & another, amici curiae, submitted a brief.

HENNESSEY, C.J. The United States Court of Appeals for the First Circuit has certified two questions to this court. See S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981). The questions concern plaintiff Vanessa Redgrave's appeal from the denial of her motion for judgment notwithstanding the verdict by a judge of the United States District Court for the District of Massachusetts following a jury verdict favorable to the defendant Boston Symphony Orchestra, Inc. (BSO), on Redgrave's claims under the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H and 11I (1984 ed.).[2] In reporting these questions, the Court of Appeals stated that a central issue in the plaintiff's appeal turns on a significant question of Massachusetts law on which no controlling precedent in the decisions of this court exists. Redgrave argued at trial and argues on appeal that the BSO should be held liable under the Massachusetts Civil Rights Act because, in cancelling its performances of Stravinsky's "Oedipus Rex," in which Redgrave was to appear as narrator, the BSO acquiesced in expressions of disapproval of her political views voiced by BSO subscribers and other members of the community. Further, she contends that other motives offered by the BSO as justification for its decision to cancel the performances should not operate as defenses under the Massachusetts Civil Rights Act.

---

[2] Vanessa Redgrave and Vanessa Redgrave Enterprises, Ltd., sued the Boston Symphony Orchestra, Inc., for breach of contract and violation of the Massachusetts Civil Rights Act. The contract claim was made on behalf of both parties, but the claim under the State civil rights act was asserted only by Redgrave. See *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 602 F. Supp. 1189, 1191 (D. Mass. 1985).

We summarize the facts relevant to the questions certified. See S.J.C. Rule 1:03, § 3 (2). In March, 1982, the BSO engaged the plaintiff, a professional actress, to appear as narrator in a series of performances of Stravinsky's "Oedipus Rex" in Boston and New York. Following announcement of the engagement, the BSO received calls from some of its subscribers and from community members protesting the engagement because of Redgrave's political support for the Palestine Liberation Organization and because of her views regarding the State of Israel. On or about April 1, 1982, the BSO cancelled its contract with Redgrave. This action was the subject of substantial attention and comment in the news media.

Redgrave and Vanessa Redgrave Enterprises, Ltd., sued the BSO for breach of contract. Redgrave also alleged violations of the Massachusetts Civil Rights Act. The plaintiffs also made several claims that were held before trial to lack merit as a matter of law. *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 602 F. Supp. 1189, 1191 (D. Mass. 1985). See *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 557 F. Supp. 230 (D. Mass. 1983). After a sixteen-day trial, the jury answered special interrogatories favorably to the plaintiffs on the breach of contract claim and favorably to the BSO on the civil rights claim. The parties filed cross motions for judgment notwithstanding the verdict. 602 F. Supp. at 1191. The Federal District Court judge denied Redgrave's motion and entered judgment for Redgrave on the breach of contract claim but held that, as a matter of law, damages were to be limited to the performance fee. *Id.*

In the order of certification, the Court of Appeals states that "BSO agents testified that the performances were cancelled because it was felt that potential disruptions, which BSO agents perceived as quite possible given the community reaction, would implicate the physical safety of the audience and players and would jeopardize the artistic integrity of the production. The district court found this testimony to be credible and worthy of substantial weight. Additionally, in response to special interrogatories, the jury found that BSO and its agents did not cancel the performances because of their own disagreement with Redgrave's political views. *Redgrave* v. *BSO*, 602 F. Supp. 1189, 1192 (D. Mass. 1985)."

The Court of Appeals further states, "Redgrave contends that even if BSO agents did not themselves disagree with her political views and did not cancel the contract because they wished to punish her for past speech or repress her future speech, BSO cancelled the contract in response to pressure from third parties who did disagree with and wished to repress Redgrave's speech. Redgrave . . . argue[s] that BSO's acquiescence to pressure from third parties made it liable under the Massachusetts Civil Rights Act, Mass. Gen. Laws Ann. c. 12, § 11H-I . . . . The district court concluded that '[a]lthough cancellation because of acquiescence when confronted with the public pressure of a vocal minority may be a breach of contract, it is not a violation of the Massachusetts Civil Rights Act.' 602 F. Supp. at 1192. According to the court, '[n]either the cancellation nor the acquiescence unaccompanied by [express personal disagreement with Redgrave's views] amounts to "threats, intimidation, or coercion" which must be proved to establish a claim under the statute.' "

Because the existence of Redgrave's claim under the Massachusetts Civil Rights Act depends on the proper interpretation of the act, the Court of Appeals certified the following two questions to this court: "1. Under the Massachusetts Civil Rights Act, Mass. Gen. Laws Ann. ch. 12, § 11H and § 11I, may a defendant be held liable for interfering with the rights of another person, by 'threats, intimidation, or coercion', if the defendant had no personal desire to interfere with the rights of that person but acquiesced to pressure from third parties who did wish to interfere with such rights? 2. If a defendant can be held liable under the Massachusetts Civil Rights Act for acquiescence to third party pressure, is it a defense for the defendant to show that its actions were independently motivated by additional concerns, such as the threat of extensive economic loss, physical safety, or particular concerns affecting the defendant's course of business?"[3]

---

[3] We acknowledge the briefs amici curiae filed by the Attorney General of the Commonwealth, the Lawyers' Committee for Civil Rights Under Law of the Boston Bar Association and the Civil Liberties Union of Massachusetts, and the American Jewish Congress.

1. *The Meaning of the Two Certified Questions*.

We answer the two certified questions in accordance with their clear and unequivocal wording. In doing so, we express no opinion on some serious issues which are not addressed in the questions but which are suggested by the record of the case.

It can be inferred from the record that the BSO was itself a victim of violations of G. L. c. 12, § 11H, by those persons who put pressure on the BSO to cancel the Redgrave participation. From the premise that the BSO had the free speech right to perform or not as it saw fit, it can be argued that the BSO's secured rights were interfered with, and that it was not within the legislative intent that anyone should be punished under c. 12 for exercising the constitutional right not to speak (i.e., perform). It can also be argued that when a private person decides not to speak and has no duty to do so, it would be unconstitutional to require that person to speak or, contractual obligations aside, to punish him civilly for not speaking.

The foregoing arguments can be focused on both of the certified questions. It can be offered that a person exercising constitutional rights who interferes with another's constitutional rights is not (Question 1) "interfering with the rights of another person by 'threats, intimidation, or coercion,'" within the meaning of G. L. c. 12, §§ 11H and 11I . It can be further offered by way of defense to an action under §§ 11H and 11I (Question 2) that the defendant was motivated by the "additional concern[]" of the artistic integrity of its production; that this motivation is within the defendant's free speech rights; and that this independent motivation, if established, is a complete defense to the action where it is also shown that the defendant had no personal wish either to punish the plaintiff or to intrude upon the plaintiff's rights.

We have not considered any of the above arguments or issues in answering the two certified questions. We treat the questions as addressed to a typical action under the Massachusetts Civil Rights Act, which does not concern a defendant who is exercising a free speech or other constitutional right in interfering with the secured rights of another. In short, we answer the two questions as they are worded.

2. *Acquiescence to Third-party Pressure as a Basis for Recovery Pursuant to G. L. c. 12, §§ 11H and 11I.*

The Massachusetts Civil Rights Act provides a State remedy for interference or attempts to interfere with the exercise or enjoyment of rights secured by the Constitution or laws of the United States or rights secured by the Constitution or laws of the Commonwealth by threats, intimidation, or coercion. G. L. c. 12, § 11H.[4] Section 11I[5] authorizes a private cause of action for the deprivation of secured rights and an award of attorneys' fees for the prevailing party. See *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 820 n.2 (1985) (*Batchelder II*). The remedy provided in §§ 11H and 11I is coextensive with the remedy provided under Federal law by means of 42 U.S.C. § 1983 (1982), except that the State statute does not condition the availability of the remedy on State action. G. L. c. 12, § 11H. *Bell* v. *Mazza*, 394 Mass. 176, 181 (1985).

Our function in interpreting any statute is to ascertain "the intent of the Legislature, as evidenced by the language used, and considering the purposes and remedies intended to be ad-

---

[4] Section 11H provides: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured. Said civil action shall be brought in the name of the commonwealth and shall be instituted either in the superior court for the county in which the conduct complained of occurred or in the superior court for the county in which the person whose conduct complained of resides or has his principal place of business."

[5] Section 11I provides: "Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court."

vanced." *Glasser* v. *Director of the Div. of Employment Sec.*, 393 Mass. 574, 577 (1984). *Commonwealth* v. *Galvin*, 388 Mass. 326, 328 (1983). *Commonwealth* v. *Graham*, 388 Mass. 115, 119 (1983). Like all civil rights statutes, §§ 11H and 11I are entitled to liberal construction. *Batchelder II, supra* at 822. 3A C. Sands, Sutherland Statutory Construction § 74.05, at 650 (4th ed. 1986). Accordingly, cases within the reason, although not within the letter, of a remedial statute are embraced by its provisions. *Batchelder II, supra.* 2A C. Sands, Sutherland Statutory Construction § 54.04, at 570 (4th ed. 1984).

To determine whether actions taken in the face of pressure from third parties violate §§ 11H and 11I, we first examine the statutory language. The statute imposes no express or implied requirement that an actor specifically intend to deprive a person of a secured right in order to be liable under the statute. Nor does the language of the statute admit of any express or implied exemption for conduct undertaken in response to third-party pressure. As we have said, the remedy provided in §§ 11H and 11I was intended to be coextensive with the remedy in 42 U.S.C. § 1983 (1982), except for the State action requirement. *Batchelder II, supra* at 822-823. *Bell* v. *Mazza, supra* at 181-182. In interpreting § 1983, the United States Supreme Court has held that specific intent is not a prerequisite to a violation of § 1983. In the case of *Monroe* v. *Pape*, 365 U.S. 167 (1961), the Supreme Court held that the absence of the term "wilfully" in § 1983 indicated that § 1983 requires only the degree of intent "that makes a [person] responsible for the natural consequences of his actions." *Id.* at 187. More recently, the Supreme Court has reiterated its conclusion in the *Monroe* v. *Pape* case in holding that § 1983 creates a civil remedy and "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." *Daniels* v. *Williams*, 474 U.S. 327, 330 (1986). *Parratt* v. *Taylor*, 451 U.S. 527, 534-535 (1981).

Similarly, c. 12, §§ 11H and 11I, contain no state of mind prerequisite for recovery. Like § 1983, c. 12, §§ 11H and 11I, do not require that the defendant's action be wilful. General

Laws c. 265, § 37, on the other hand, which provides for criminal penalties in cases of civil rights violations, and was enacted at the same time as the "civil" counterpart in §§ 11H and 11I, requires that the defendant's action be wilful.[6] In *Batchelder II, supra*, a security guard was merely enforcing a general rule of the defendant shopping center against distribution of materials and solicitation. It was not shown that there was any specific opposition to the message Batchelder was attempting to spread. We think our reasoning in that case supports a conclusion that the statute's coercion requirement was satisfied simply because the natural effect of the defendant's action was to coerce Batchelder in the exercise of his rights. *Id.* at 823.

Making an exemption for civil rights deprivations resulting from third-party pressure "would reward and encourage" the very conduct which the substantive statutes prohibit. See *Sarni Original Dry Cleaners, Inc.* v. *Cooke*, 388 Mass. 611, 618 n.7 (1983). Whether the issue is phrased in terms of the existence of a specific intent requirement under the Massachusetts Civil Rights Act or a third-party pressure exemption from the statute, recognizing such an exemption would tend to eviscerate the statute and defeat the legislative policies behind the statute. Persons seeking to interfere with the civil rights of others in violation of the statute may not know or believe that the interference may lead to civil or criminal liability. Thus, to be effective, the provisions of §§ 11H and 11I must apply to any threatening, intimidating, or coercive behavior regardless of whether the defendant specifically intended to interfere with a right to which the plaintiff is entitled. Accordingly, we answer, "Yes," to the first question.

*3. Availability of Defenses Under the Massachusetts Civil Rights Act when Liability is Based on Acquiescence to Third-party Pressure.*

The second question certified to us asks us to consider whether it is a defense to liability for acquiescence to third-party

---

[6] In pertinent part, G. L. c. 265, § 37 (1984 ed.), reads as follows: "No person, whether or not acting under color of law, shall by force or threat of force, *willfully* injure, intimidate or interfere with . . . any other person in the free exercise or enjoyment of any right. . ." (emphasis added).

pressure "for the defendant to show that its actions were independently motivated by additional concerns, such as the threat of extensive economic loss, physical safety, or particular concerns affecting the defendant's course of business."

As an abstract proposition, fear of business disruption, fear for economic loss, or fear for physical safety are not justifications under §§ 11H and 11I. The legislative intent would be negated if such defenses were permitted. See *Sarni Original Dry Cleaners, Inc.* v. *Cooke, supra*. In an analogous context, the Supreme Court has rejected the notion that private biases and injuries that may be inflicted as a result of such biases are permissible justifications for deprivations of constitutional rights. *Palmore* v. *Sidoti*, 466 U.S. 429 (1984). Fear that the prejudice of third-party actors may lead to a breach of the peace has also been rejected as a justification for deprivations of civil rights. *Buchanan* v. *Warley*, 245 U.S. 60, 81 (1917). We recognize that explicit and imminent danger of physical harm might well in some circumstances justify interference with an individual's civil rights (cf. *Brandenburg* v. *Ohio*, 395 U.S. 444, 447 [1969]), but the certified question raises no such premise. Our answer to the second certified question is, "No."

4. *Conclusion.*

We answer, "Yes" to the first certified question, and "No" to the second certified question.


WILKINS, J. (concurring, with whom Abrams, J., joins). I concur in the answers given to the questions as the Chief Justice's opinion has construed them. I do not, however, as he does, regard the questions as clear and unequivocal. Indeed, his discussion of the meaning of the questions in the first numbered part of his opinion indicates that substantial constitutional questions may be explicitly, and surely are impliedly, involved in the questions. Perhaps the Court of Appeals intended to insulate us from consideration of constitutional issues. Certainly from the briefs filed with us it is clear that constitutional considerations, particularly the BSO's rights of free

speech, are thought to be seriously involved. Because the BSO's constitutional right to free speech under art. 16 of the Massachusetts Declaration of Rights is present in this case, it may seem surprising to some that no question has been asked of us concerning the BSO's State constitutional right to determine not to perform "Oedipus Rex." Perhaps the Court of Appeals has already concluded that, if the nonconstitutional grounds indicated by its questions are not dispositive of Redgrave's claim, First Amendment considerations will be and that, therefore, it need not ask us about analogous State constitutional considerations.

I have been unable to think of any theory under which, in the circumstances, statutory liability may properly be imposed on the BSO in the face of its State constitutional right to determine what artistic performances it will or will not perform. Redgrave's constitutional rights are no greater than those of the BSO, and there was no way in which the interests of each could be accommodated. Cf. *Batchelder* v. *Allied Stores Int'l, Inc.*, 388 Mass. 83, 92-93 (1983) (defendant's property interest could be accommodated with the plaintiff's constitutional right to gather signatures on nomination papers).

O'CONNOR, J. (dissenting, with whom Lynch, J., joins). I do not agree that G. L. c. 12, § 11I, imposes liability on a defendant whose intentional conduct unintentionally causes interference with a plaintiff's secured right. The language of the statute and its purpose as evidenced by legislative history demonstrate that a plaintiff's right of recovery is contingent on a showing of the defendant's specific intent.

To understand c. 12, § 11I, one must appreciate the distinction between intent and motive — a distinction our law, particularly our criminal law, frequently makes. A man motivated by hostility may strike another man, intending to inflict pain. A second man, harboring no ill will toward the victim but only motivated by a desire to please third persons, may also strike another man, intending to inflict pain. Both actors have the specific intent to inflict pain although their motives are differ-

ent. The relevancy of the distinction between intent and motive will become apparent later in this opinion.

Also, to understand c. 12, § 11I, one must be aware that an act may have many natural, even inevitable, effects, and that the actor may intend only some of those effects without intending the others no matter how clearly he foresees them. The surgeon, for example, treats his patient with the specific intent to improve the patient's health. The surgeon knows that the treatment unavoidably will cause pain; yet he does not intend the pain since it is not the pain that produces the desired result. Of course, as an evidentiary matter, a fact finder is warranted in finding that a defendant specifically intended the natural consequences of his voluntary act, but that inference is not required and frequently, as illustrated by the example of the surgeon, is inappropriate.

Another illustration of an act having multiple effects comes to mind. It may be that the BSO's cancellation of the performances of "Oedipus Rex" had several effects that were both natural and specifically intended, such as the removal of the risk of injury to performers and to the audience and the prevention of disruption that could destroy an artistic performance. Another natural effect of the BSO's act might have been the chilling of Redgrave's right on a future occasion to express her political views, but that effect may not have been intended by the BSO since the assurance of safety and the prevention of disruption at the time of the intended performance would not be advanced by the chilling of Redgrave's rights of political speech in the future. It may be that the BSO intended only to exercise its constitutional right not to present an inartistic performance and not to subject its performers and audience to danger, and that it had no interest in silencing Redgrave's future political expressions.

General Laws c. 12, § 11I, provides injunctive and monetary relief for interference or attempted interference with secured rights "by threats, intimidation or coercion." As the Chief Justice's opinion observes *ante* at 99, civil rights statutes should be liberally construed to accomplish their remedial purpose, *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 822

(1985) (*Batchelder II*); 3A C. Sands, Sutherland Statutory Construction § 74.05, at 650 (4th ed. 1986), but as the Chief Justice's opinion also notes, *ante* at 98-99, quoting *Glasser* v. *Director of the Div. of Employment Sec.*, 393 Mass. 574, 577 (1984), the court's primary function in interpreting any statute is to ascertain "the intent of the Legislature, as evidenced by the language used, and considering the purposes and remedies intended to be advanced." Having stated those relevant principles, the Chief Justice's opinion omits any discussion of the usual meaning given to the words, "threats, intimidation, or coercion," and it fails to consult legislative history as a source of information concerning the objective the statute was designed to achieve. A proper response to the certified questions is impossible without consideration of these matters.

A threat is commonly understood to be a wilful expression of intention to inflict injury or damage on another. Intimidation ordinarily means putting in fear for the specific purpose of compelling or deterring another's conduct. Coercion is the intentional restraint or domination of another's will. Presumably, the statutory word "coercion" in the term "threats, intimidation or coercion," refers to a type of restraint other than the restraint accomplished by means of fear. "Coercion" appears to refer to restraint accomplished by physical force. Certainly, the three words together connote the deliberate use of force, moral or physical, to control another's conduct. Therefore, in order to recover damages under G. L. c. 12, § 11I, construed according to the ordinary usage of its language, a plaintiff must prove the defendant's specific intent to interfere with the plaintiff's secured rights.

That the Legislature intended specific intent to interfere with secured rights as an essential element of a cause of action under G. L. c. 12, § 11I, is made abundantly clear by the Governor's legislative file on House Bill No. 3135, Chapter 801 of the Acts of 1979, in the State Archives. Before enactment, §§ 11H and 11I were part of that House Bill. *Batchelder II, supra* at 821. The file contains the "history of . . . [the] enactment process and various statements concerning the nature and effect of the proposed law. As such, the file is 'an instruc-

tive source, indicative of what meaning the legislature intended.' 2A C. Sands, Sutherland Statutory Construction § 48.04, at 300 (4th ed. 1984)." *Batchelder II, supra* at 821 n.3.

In *Batchelder II, supra* at 821, we said: "The Legislature passed this statute to respond to a need for civil rights protection under State law. Deprivations of secured rights by private individuals using violence or threats of violence were prevalent at the time that the Legislature considered G. L. c. 12, §§ 11H and 11I. See Boston City Council Resolution of November 14, 1979, endorsing House Bill No. 3135 noting 'serious problems of racial harassment.' Aggrieved parties often could not succeed under 42 U.S.C. § 1983 (Supp. V 1981), because the Federal statute requires 'State action.' See *Williams* v. *Hot Shoppes, Inc.*, 293 F.2d 835, 836, 837 (D.C. Cir. 1961), cert. denied, 370 U.S. 925 (1962). Criminal prosecutions under State law were also unsatisfactory; convictions were difficult and the victim was not compensated for the harm." Other documents in the Governor's legislative file, far too numerous to identify, much less quote, demonstrate beyond reasonable question that c. 12, § 11I, was enacted in response to a concern about the inadequacy of then current law to deal generally with discrimination against minority groups, and more specifically, to deal with racial violence. Racial discrimination and violence involve conduct that is specifically designed to interfere with secured rights, and it is that kind of conduct that the Legislature made the basis of civil liability.

We said as much in *Bell* v. *Mazza*, 394 Mass. 176 (1985). In that case, we held that a complaint under G. L. c. 12, § 11I, was sufficient to withstand a motion to dismiss. We pointed out that the complaint alleged that one of the defendants "threatened to do anything at any cost to prevent the plaintiffs' construction of [a] tennis court. The plaintiffs alleged that shortly after this threat they received a letter which stated all the defendants had joined in an association to prevent the plaintiffs from constructing the tennis court." *Id.* at 183-184. "From these allegations," we said, "it could be inferred that the defendants engaged in a joint venture *with the goal* of interfering with the plaintiffs' property rights. . . . The plain-

tiffs sufficiently alleged threats, intimidation, or coercion in their complaint." (Emphasis added.) *Id.* at 184. Hence in *Bell v. Mazza, supra,* the court focused on the defendants' specific intent to prevent the plaintiffs' exercise of their constitutional rights as support for the court's conclusion that the plaintiffs had stated a claim under c. 12, § 11I. As the court put it, "[t]he interpretation of G. L. c. 12, § 11I, that we adopt today does not result in creating a vast constitutional tort. The Legislature explicitly limited this remedy to situations where the derogation of secured rights occurs by 'threats, intimidation or coercion.' " *Id.* at 182.

The language of G. L. c. 12, § 11I, its legislative history, precedent, and the undesirability of expanding a reasonable statute into one that would create a vast and uncontrollable constitutional tort forcefully demonstrate that the statute is properly interpreted to provide for liability only when the defendant interferes with a plaintiff's secured rights with the specific intent to do so. That specific intent is required is also supported by another consideration. The Chief Justice's opinion recognizes, *ante* at 97, that its answers to the certified questions may implicate serious constitutional questions stemming from the BSO's constitutional right not to speak (i.e., perform), and not to be civilly liable for not speaking. Those constitutional questions are reduced or altogether removed by construing § 11I as imposing liability only on a defendant who specifically intends to interfere with another's secured rights. "It is our duty to construe statutes so as to avoid . . . constitutional difficulties, if reasonable principles of interpretation permit." *Langone v. Secretary of the Commonwealth,* 388 Mass. 185, 190 (1983), appeal dismissed, 460 U.S. 1057, quoting *School Comm. of Greenfield v. Greenfield Educ. Ass'n,* 385 Mass. 70, 79 (1982).

The Chief Justice's opinion's conclusion that c. 12, § 11I, does not require specific intent effectively converts the statute, into one that provides for liability whenever there is a causal connection between the defendant's intentional act (without reference to the actor's goal) and an interference with a secured right of the plaintiff, thus depriving the words "threats, intimi-

dation or coercion" of any meaning. This is contrary to accepted principles of statutory construction. In arriving at that conclusion, the Chief Justice's opinion notes that specific intent is not a prerequisite to a violation of 42 U.S.C. § 1983 (1982) and relies on our statement in *Batchelder II, supra* at 822-823, that "the Legislature intended to provide a remedy under G. L. c. 12, § 11I, coextensive with 42 U.S.C. § 1983 (Supp. V 1981), except that the Federal statute requires State action whereas its State counterpart does not." *Ante* at 98. The question in *Batchelder II* was whether the plaintiff had "prevailed" within the meaning of G. L. c. 12, § 11I, in an earlier case in this court, *Batchelder v. Allied Stores Int'l, Inc.*, 388 Mass. 83 (1983) (*Batchelder I*), a case in which the defendant's specific intent was clear. The court noted that § 11I "is similar to 42 U.S.C. § 1988 to the extent that both statutes use the term 'prevail' to determine a party's right to attorneys' fees," *Batchelder II, supra* at 821, and the court concluded that, just as the plaintiff would have been entitled to attorneys' fees under the Federal statute in the circumstances of *Batchelder I*, if the Federal statute applied to private action, so too he was entitled to attorneys' fees under § 11I. It was in that context that the court said that the *remedy* under the Federal and State statutes is coextensive. The court understandably did not say that because 42 U.S.C. § 1983 (1982) has no specific intent requirement, neither does c. 12, § 11I, have such a requirement. Not only is 42 U.S.C. § 1983 (1982) concerned only with State action, but also § 1983 does not contain the language "threats, intimidation or coercion" or words of similar import. The statutes can be given the same meaning only by ignoring critical differences in their language and their purposes.

The Chief Justice's opinion finds support for its conclusion that §§ 11H and 11I contain no state of mind prerequisite for recovery by contrasting those sections with G. L. c. 265, § 37 (1984 ed.), which imposes criminal penalties for civil rights violations and was enacted at the same time §§ 11H and 11I were enacted. St. 1979, c. 801, §§ 1, 2. General Laws c. 265, § 37, provides that "[n]o person . . . shall by force or threat of force, willfully injure, intimidate or interfere with . . . any

other person in the free exercise or enjoyment of any right . . . .." Threats, intimidation, and coercion, as commonly understood, are wilful. The fact that the Legislature refrained from using redundant language in §§ 11H and 11I although such redundancy appears in the criminal statute ("willfully" and words of similar import are frequently used in criminal statutes), should not lead the court to construe §§ 11H and 11I in a way that distorts the ordinary meaning of the statutory language, disregards the legislative history indicating the legislative concern prompting enactment of those sections, disregards precedent, and leads to the creation of a vast new constitutional tort.

In his brief as amicus curiae, the Attorney General argues for the statutory construction adopted by the court. His position appears to result from his failure to make the very important distinction between specific intent and motive. He tells us of the numerous injunctions he has obtained prohibiting defendants individually and in groups from engaging in threats, intimidation, or coercion that would deprive others of rights secured by State or Federal law. The Attorney General describes those cases as follows: "All of the cases brought by Attorney General Bellotti under G. L. c. 12, § 11H have involved severe deprivations of basic rights, by means including physical assault, property vandalism, and threats to safety. Several of the cases have involved defendants engaged in group conduct." The Attorney General argues that "[s]eparating out individual motivation would be virtually impossible in such group cases. In these circumstances, especially where defendants are youthful and part of a 'gang', peer pressure is as powerful a force as individual invidious intent. G. L. c. 12, § 11H is an invaluable law enforcement tool for the preservation of civil rights in the Commonwealth. It would be eviscerated were the Attorney General required to prove such personal *motivation* in each case" (emphasis added). The Chief Justice's opinion exhibits both a concern and a misunderstanding similar to those of the Attorney General, when it says that "[w]hether the issue is phrased in terms of the existence of a specific intent requirement under the Massachusetts Civil Rights Act or a third-party pres-

sure exemption from the statute, recognizing such an exemption would tend to eviscerate the statute and defeat the legislative policies behind the statute." *Ante* at 100.

The concerns of the Attorney General and the plurality are met by §§ 11H and 11I even though those sections are construed to require specific intent. Surely, the Attorney General as well as a private individual should be entitled to relief without having to prove that the defendant's purposeful conduct was motivated by his hatred or intolerance, rather than his acquiescence to third-party pressure, but it is not necessary to read the requirement of specific intent out of the statute in order to accomplish that result. If a defendant is shown to have used threats, intimidation, or coercion for the purpose of interfering with secured rights, whether he knows they are secured or not, relief is appropriate without a further showing of why the defendant formed that purpose. Nothing in the statute requires proof of motive in addition to specific intent.

The first certified question asks whether, under c. 12, §§ 11H and 11I, a defendant may "be held liable for interfering with the rights of another person, by 'threats, intimidation, or coercion', if the defendant had no personal desire to interfere with the rights of that person but acquiesced to pressure from third parties who did wish to interfere with such rights." This question reasonably may be understood as *assuming* that the statute requires proof of a specific intent to interfere with secured rights as a prerequisite to recovery (in accordance with the plain meaning of the words "threats, intimidation or coercion"), and as inquiring whether such intentional interference may be the basis of liability although it is motivated by third-party pressure rather than by the defendant's personal animosity toward the plaintiff or the plaintiff's exercise of secured rights. The second question then inquires whether, if intentional interference with secured rights may be the basis of liability although it was motivated by third-party pressure, the defendant may nevertheless be exempt from liability by showing that "its actions were independently motivated by additional concerns, such as the threat of extensive economic loss, physical safety, or particular concerns affecting the defendant's course of busi-

ness." I believe that the certified questions focus on motive, not on intent. Interpreting the questions that way, I agree with the Chief Justice's opinion that the answer to the first question is "Yes," and the answer to the second question, is "No." On the other hand, if the first question is not construed as assuming that the statute imposes liability only on proof of the defendant's specific intent to interfere with the plaintiff's secured rights, I would answer that a defendant may be liable only if his specific intent be established, but if the defendant's specific intent is established, the defendant is not excused by having been motivated by third-party pressure. I would answer the second question by saying that the defendant's intentional interference with secured rights would not be excused by the fact that the defendant was motivated not only by third-party pressure but also by additional concerns such as the threat of extensive economic loss, physical safety, or concerns affecting the defendant's course of business.

In my view, discussion of one further matter is appropriate, even though it is not required by the certified questions apart from the context in which they arose. Redgrave has not identified the secured right with which the defendant has allegedly interfered. Her brief appears to characterize the cancellation of "Oedipus Rex" as punishment for her earlier political statements. Punishment for the exercise of a right in the past is not, by itself, interference with the right. Interference requires that there be a limitation on the present or future exercise of the right. At best, cancellation of "Oedipus Rex" in response to third-party pressure may have conveyed a message to Redgrave that in the future other performances may be cancelled, but the conveyance of that message did not amount to threat or intimidation unless it suggested that the BSO itself intended to take future harmful action against her. Mere cancellation of the performances would not appear to convey the message that the BSO intended to take any future action. Furthermore, cancellation of the performance, at which no political speech was expected, did not constitute interference with secured rights by coercion. Thus, it is doubtful that in this case, interference with secured rights by threats, intimidation, or coercion was shown even if no specific intent was required.