Joanne CHILSON

v.

POLO RALPH LAUREN RETAIL CORPORATION.

No. CIV. A. 98–10081–RGS.

United States District Court, D. Massachusetts.

July 7, 1998.

Christine A. Faro, Boston, MA, for Plaintiff.

Dennis M. Kelleher, Matthew J. Matule, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, Brian S. Kaplan, Skadden, Arps, Slate, Meagher & Flom, New York, NY, for Defendant.

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

STEARNS, District Judge.

Joanne Chilson was employed by Polo Ralph Lauren Retail Corporation ("Polo") from September 1988 until she was fired on April 15, 1997. Chilson alleges that she was terminated in reprisal for complaining about her supervisor's intimidating, coercive and at

times, criminal behavior. Chilson contends that Polo breached her employment contract. Polo moves to dismiss the Complaint, contending that Chilson was an at-will employee and thus subject to a liberal rule of discharge.[1]

### FACTS

The facts, in the light most favorable to Chilson as the non-moving party, are as follows. In September 1988, Chilson was hired by Polo as a cashier in the shipping and receiving department. Complaint ¶ 6.[2] In September 1989, Polo transferred Chilson to its Boston store as a sales associate in the women's wear department. Id., at ¶ 7. As a sales associate, Chilson worked on a commission basis, earning a 7% draw on total sales (8% after her sales reached $25,000), payable bi-weekly. Id., at ¶ 10. Chilson met all sales goals without any write-ups, demerits or demotions. She earned approximately $25,000 a year. Id., at ¶ 19.

In September 1990, Chilson was promoted to Ladies' Department Manager. As a department manager, Chilson's duties included merchandising, training and managing a staff of four to six employees, and overseeing the operations of a department grossing sales of 1.3 million dollars. Chilson's work record was exemplary. Id., at ¶ 16. Between January 1, 1996, and April 15, 1997 Chilson received two awards and two bonuses for exceeding department goals. Id., at ¶ 24.

On January 1, 1996, Suzanna Bryant was appointed store manager of the Boston store. Id., at ¶ 17. Shortly thereafter, Polo distributed a Subsidiaries' and Affiliates' Handbook to employees including Chilson. On March 16, 1996, Chilson signed an "Acknowledgment of Receipt," confirming that she had received a copy of the Handbook.[3] O'Mara

---

1. In the event the court were to find that no contract existed with Polo, Chilson has alleged in the alternative that she was discharged in violation of the "public policy" exception to the at-will rule and the implied covenant of good faith and fair dealing.

2. The citations throughout are to the Second Amended Complaint.

3. The Handbook and Acknowledgment Form were not attached to the First Amended Com-

plaint. The court, however, invited the parties to submit copies pursuant to Fed.R.Civ.P. 12(c), on the understanding that they would be considered only with regard to Chilson's contract claims. Chilson's Second Amended Complaint, filed with the court on June 8, 1998, attaches the Handbook as Exhibit 1.

Aff., at Ex. A. The Acknowledgment Form contains the following in bold-face type:

**I understand that I am free to resign my employment at any time and the company is likewise free to terminate my employment at any time with or without cause or notice. This Handbook shall not be considered to be a contract of employment, express or implied.**

The Acknowledgment Form also states that "[t]he Company reserves the sole right in its business judgment to modify, suspend, interpret, or cancel in whole or in part at any time, and with or without any notice, any of the published or unpublished personnel policies in practice." A similar disclaimer appears in boldface type on page one of the Handbook under the heading "Introduction."

**The policies stated in this Handbook are subject to change without notice, at the sole discretion of the Company. It should also be understood that this Handbook is not a contract, express or implied, nor does it guarantee employment for any specific duration. Please understand that no Manager or Representative of the Company, other than a Corporate Officer, has the authority to enter into any agreement with you for employment for any specified period, or to modify the policies or benefits of the Company, or to make any promises or commitments. Further, any employment agreement entered into by the Company's authorized Representative is not enforceable unless it is in writing.**

Between June 1, 1996, and April 15, 1997, a series of disputes arose between Chilson and Bryant, regarding Bryant's management of Chilson's staff and the store. Chilson disapproved of Bryant's preferential treatment of certain employees in setting work hours and time off; her public behavior towards male clientele; her practice of serving alcohol to staff (including minors) as an inducement to work extra hours; and her "vindictive and intimidating acts towards em-

ployees who disapproved of her conduct." Complaint ¶¶ 27–29. Polo's Human Resources Department was unresponsive to employees (apart from Chilson) who complained about Bryant's behavior.[4] Id., at ¶ 28.

In December of 1996, pursuant to Polo's "Open Door Policy," Chilson "made calls" about Bryant to Polo's Human Resources Department. Id., at ¶ 30. In March of 1997, Chilson met with Polo's Boston District Manager, Greg Ladley, and, repeated her concerns about Bryant. When Chilson raised the possibility of retaliation by Bryant, Ladley responded, "Don't worry Joanne, I will not let anything happen to you." Id., at ¶ 33.

In April of 1997, Polo transferred Bryant to its Washington D.C. store. Id., at ¶ 34. On April 15, 1997, just prior to leaving Boston, Bryant terminated Chilson, effective immediately, "because it wasn't working out." Id., at ¶ 35. On May 7, 1997, Polo announced that it was going public and offered all employees stock options based upon the length of their employment. Id., at ¶ 38. On December 3, 1997, Chilson filed this lawsuit in Suffolk Superior Court.[5] Polo then removed the case to the federal district court.

### DISCUSSION

#### Count I—Breach of Contract

Chilson alleges that Polo's Employee Handbook constitutes a binding contract of employment, upon which she reasonably relied in complaining about Bryant to upper level management. Despite the assurances of the Handbook's "Open Door Policy," Chilson contends that she was fired (in breach of the terms of her employment) in retaliation for her complaints. Chilson also maintains that the Handbook promised continued employment to employees (like Chilson) whose performance exceeded Polo's expectations. Polo asserts that Chilson was an at-will em-

---

4. Chilson states that these unidentified employees were either discharged by Bryant or quit employment at Polo. Id., at ¶ 28.

5. The Complaint as originally amended contained three counts: Count I—Breach of Contract; Count II—Breach of Implied Covenant of Good Faith and Fair Dealing; and Count III—

G.L. c. 12, § 11I (Massachusetts Civil Rights Act). Chilson subsequently filed a Second Amended Complaint adding a count for wrongful termination and substituting Consolidated Polo Retailers, Inc., for Polo Ralph Lauren Retail Corporation.

ployee dischargeable "for almost any reason at all." *Jackson v. Action for Boston Community Development, Inc.*, 403 Mass. 8, 9, 525 N.E.2d 411 (1988).

■ Under Massachusetts law, a personnel manual can form the basis of an employment contract where the employee reasonably believes "that the employer was offering to continue the employee's employment on the terms stated in the manual." *O'Brien v. New England Telephone & Telegraph Company*, 422 Mass. 686, 692–693, 664 N.E.2d 843 (1996). In *Jackson*, 403 Mass. at 14–15, 525 N.E.2d 411, the Supreme Judicial Court set out a list of factors that "might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract." *O'Brien*, 422 Mass. at 692, 664 N.E.2d 843. Among these factors is the extent to which the terms of the manual were the subject of negotiation, whether the employer retained the right to unilaterally modify any such terms, whether the employee was required to sign the manual, whether the language of the manual provides the employee with something more than general guidance, whether the employer specifically retained the right to fire the employee without cause, and whether the manual sets out a disciplinary procedure defining grounds for discharge. Id., at 691–694, 664 N.E.2d 843. While the *Jackson* factors "are not a rigid list of prerequisites," they provide "sound" guidance. Id., at 691–692, 664 N.E.2d 843.

■ Polo's Employee Handbook states no term of employment, its content was not a subject of negotiation, and Polo retained the right to modify the Handbook unilaterally. The Handbook repeatedly reminds employees (in bold print) that its provisions do not form the basis of an employment contract, and that Polo has the right to fire employees at any time without cause. The Handbook also specifies that an employee's participation in its procedures is voluntary. The Introduction sets out Polo's "philosophy" in the bland "mission statement" language that is faddish

in certain corporate cultures. The section explaining Polo's "Open Door Policy" (upon which Chilson claims to have relied), "encourages" employees to "share their ideas and express their concerns." Wlson was required to sign an acknowledgment of having received a copy of the Handbook, that fact alone could not be reasonably construed as the acceptance of a binding offer. In sum, no reasonable employee could have thought that the Handbook amounted to a contract of employment. See *Hinchey v. NYNEX Corporation*, 144 F.3d 134, 141 (1st Cir.1998).

*Count II—Wrongful Termination/Discharge*

■ "Redress is available for [at-will] employees who are terminated for asserting a legally guaranteed right, for doing what the law requires, or for refusing to do that which the law forbids." *Smith–Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 149–150, 533 N.E.2d 1368 (1989). The law also, in limited circumstances, protects at-will employees who are terminated for performing "important public deeds." *GTE Products Corp. v. Stewart*, 421 Mass. 22, 26, 653 N.E.2d 161 (1995). Chilson alleges that she was fired in retaliation for reporting Bryant's criminal acts, specifically, her distributing of alcohol to minors (M.G.L. c. 138, § 34) and her "open and gross" conduct (M.G.L. c. 272, § 16). It is clear under Massachusetts law that an at-will employee has a cause of action if discharged for complaining about criminal conduct, even if the complaint is made internally to the employer rather than to public authorities. *Shea v. Emmanuel College*, 425 Mass. 761, 762–763, 682 N.E.2d 1348 (1997).[6]

■ Chilson's counsel represents that Bryant frequently displayed herself naked to employees and customers in the Boston store. This might constitute a crime under c. 272, § 16 (open and gross lewdness). But see *Commonwealth v. Gray*, 40 Mass.App.Ct. 901, 902 n. 1, 660 N.E.2d 695 (1996) (section 16 is ordinarily deployed to prosecute adults

---

**6.** The public policy exception does not cover what are fundamentally disagreements over internal business matters or policies. *Smith–Pfeffer*, 404 Mass. at 151, 533 N.E.2d 1368. See

*Upton v. JWP Businessland*, 425 Mass. 756, 758, 682 N.E.2d 1357 (1997) (complaints regarding excessive work hours).

who expose themselves to children). See also *Commonwealth v. Fitta*, 391 Mass. 394, 396, 461 N.E.2d 820 (1984) (to be prosecutable under section 16, a defendant's indecent act must be committed in such a way as to cause alarm or shock in the intended victim). Compare M.G.L. c. 272, § 53 (misdemeanor indecent exposure).[7] Chilson also alleges that Bryant served alcohol to minors at company staff meetings. Complaint ¶ 25. Chilson states that she complained about these incidents to Greg Ladley, Polo's District Manager. Id., at ¶ 32. Finally, she alleges that she was fired in retaliation for the reports. For purposes of the motion to dismiss, these allegations are sufficient to make out a viable cause of action for wrongful discharge under *Shea*, supra.

### Count III—Breach of Implied Covenant of Good Faith and Fair Dealing

Chilson claims that Polo terminated her to deprive her from participating in the company's anticipated public offering in violation of the implied covenant of good faith and fair dealing. See *McCone v. New England Telephone & Telegraph Co.*, 393 Mass. 231, 233–234, 471 N.E.2d 47 (1984). This exception to the at-will rule applies only to employee commissions, pay or benefits that have been "fairly earned and legitimately expected." *King v. Driscoll*, 424 Mass. 1, 7, 673 N.E.2d 859 (1996). It does not apply to expectancies that are anticipated as an incident of future employment. See *Gram v. Liberty Mut. Ins. Co.*, 391 Mass. 333, 334–335, 461 N.E.2d 796 (1984). The stock options at issue were announced on May 7, 1997, when Polo initiated its public offering. Chilson was terminated on April 15, 1997. The right to purchase the options had not vested by the time Chilson was terminated. Thus, she has no claim under the implied covenant.

### Count IV—Massachusetts Civil Rights Act

Count IV alleges a cause of action under the state Civil Rights Act, M.G.L. c. 12, § 11I. The purpose of the state Civil Rights Act is to provide under state law a remedy "coextensive with 42 U.S.C. § 1983 ... except that the Federal statute requires State action, whereas its State counterpart does not." *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822–823, 473 N.E.2d 1128 (1985). The Civil Rights Act is remedial in nature. It creates no substantive rights. *Mouradian v. General Electric Co.*, 23 Mass. App.Ct. 538, 543, 503 N.E.2d 1318 (1987). Moreover, in deference to a legislative concern that the Civil Rights Act not be interpreted to create a "vast constitutional tort," the Act is "explicitly limited ... to situations where the derogation of secured rights occurs by threats, intimidation or coercion," almost always arising in the context of a of physical confrontation. *Bally v. Northeastern University*, 403 Mass. 713, 718 & 719–720, 532 N.E.2d 49 (1989). Cf. *Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 95, 502 N.E.2d 1375 (1987) (contractual coercion). For purposes of the Civil Rights Act, " 'threat' ... involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm ... 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct ... ['Coercion' involves] 'the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done.' " *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474, 631 N.E.2d 985 (1994). Whether a defendant's actions were such as to induce fear or apprehension of harm in the victim is tested by an objective standard. *Id.* at 474–475, 631 N.E.2d 985. See *Batchelder*, 388 Mass. at 85–86, 445 N.E.2d 590 (threat of arrest by security guard); *Bell v. Mazza*, 394 Mass. 176, 179–180, 474 N.E.2d 1111 (1985) (physical threats); *Commonwealth v. Guilfoyle*, 402 Mass. 130, 132, 134, 521 N.E.2d 984 (1988) (racial harassment); *O'Connell v. Chasdi*, 400 Mass. 686, 687–688, 511 N.E.2d 349 (1987) (sexual harassment); *Langton v. Secretary of Public Safety*, 37 Mass.App.Ct. 15, 17–18, 20, 636 N.E.2d 299 (1994) (threats of retribution by prison officials); *Planned Parenthood League of Massachusetts*, 417 Mass. at 471–473 & n. 8, 631 N.E.2d 985

---

7. Section 53 requires exposure of the genitalia, not merely the genital area, to complete the crime. *Commonwealth v. Arthur*, 420 Mass. 535, 540, 650 N.E.2d 787 (1995).

(invasion and blockade of an abortion clinic). On the other hand, "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion." *Longval v. Commissioner of Correction,* 404 Mass. 325, 333, 535 N.E.2d 588 (1989).

Chilson's Civil Rights Act claim fails because there is no allegation of any "threat, intimidation or coercion" involving physical or morally coercive force that satisfies the entry level burden of the Act. Nor does the alternate theory of coercive interference with a contractual right posited in *Redgrave,* supra, apply (assuming that it remains viable under Massachusetts law) as Chilson has no contractual claim on her employment with Polo.

### ORDER

For the foregoing reasons, the motion to dismiss Counts I, III and IV of the Second Amended Complaint is *ALLOWED.* The motion to dismiss Count II of the Second Amended Complaint is *DENIED.*

SO ORDERED.